1

2

3

4

5

6

7

8                                UNITED STATES DISTRICT COURT

9                          FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   PHILLIP ARTHUR THOMPSON,                    No.  2:11-cv-1318 GEB AC

12                    Petitioner,

13          v.                                   FINDINGS AND RECOMMENDATIONS

14   KATHLEEN DICKINSON,

15                    Respondent.

16

17          Petitioner is a state prisoner serving an indeterminate life sentence, proceeding pro se with

18   an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  The amended petition,

19   ECF No. 10, is 432 pages long (not including three volumes of exhibits and a 61-page Table of

20   Contents) and contains more than thirty overlapping claims challenging petitioner's 2008

21   conviction for a 1971 murder.[1]  Respondent has answered, ECF No. 29, and petitioner filed a

22   traverse, ECF No. 34.

23   ////

24   ////

---

[1] In addition to being excessively long, the petition is repetitive, convoluted, and exceptionally
dense.  The Table of Contents, ECF No. 10 at 7-68, reflects a byzantine pattern of repeated and
overlapping allegations and legal theories, cross-references, and variations on claims.  The court
has expended significant time and effort in attempting to distill the essence of petitioner's claims
and identify the relevant portions of the state court record.

1

BACKGROUND

Twenty-two year old Betty Cloer was murdered in 1971.  The investigation hit a dead end, and the case remained cold for over thirty years.  In 2002, DNA from seminal fluids on the victim's clothing was compared to an offender database, and was matched to petitioner's DNA. Petitioner was subsequently tried and convicted of first degree murder.

The Trial

*Prosecution case*

On the evening of June 18, 1971, Betty Cloer went to a dance club in Sacramento with her friends Karen Chappell[2] and Robin Messner.  Chappell was Cloer's co-worker, and Messner and Cloer lived in the same apartment complex in Sacramento.  Cloer's roommate Elizabeth Ford stayed home alone that evening, and Messner's younger sister babysat Cloer's young son at Messner's apartment.  Later that evening Messner left the club with her boyfriend.  Chappell and Cloer left the club around 1:00 a.m. on June 19 in Chappell's car.

Chappell stopped at a Texaco gas station on Madison Avenue in order to use the restroom. The restroom was at the back of the station near a vending machine.  When Chappell pulled into the station, she saw a vehicle at the back of the station and a young man squatting near the vending machines.  The man appeared to Chappell to be young, of medium height and build, with dark hair.  The vehicle was a white or off-white four-door with a hard top that appeared to Chappell to be a 1963 Oldsmobile.

Chappell went into the restroom and Cloer remained in the car.  When Chappell came out of the restroom, she saw the man just getting into his car.  The man pulled out of the gas station and Chappell followed him.  At one point, the cars pulled side-by-side and Cloer rolled down her car window to speak to the man.  Cloer told Chappell the guy was a "fox" and thought he was going to follow them.

When the two women arrived at Cloer's apartment complex, the man pulled up behind them.  Cloer got out and told Chappell she was going back to speak with him.  As Cloer walked

---

[2] At the time of petitioner's trial, Chappell used the name Hulse.

1  back toward the man's car, Chappell drove away.

2         Sometime between 1:00 and 2:00 a.m. Cloer went into her apartment, where Ford was

3  sleeping on a couch in the living room.  Cloer told Ford she was going to Lake Tahoe and needed

4  a coat.  Cloer left the front door open and Ford could see a man standing outside.  He was

5  approximately 6'2" to 6'4" tall.  Ford did not see his face.  Cloer grabbed her coat and left with

6  the man.  According to Ford, she was the only person in the apartment when the victim arrived to

7  get a coat.

8         Cloer then went to Messner's apartment to tell Messner she was going to Lake Tahoe.

9  Messner saw a tall man with dark hair with Cloer.  Cloer left with the man.

10        Stanley Ellis provided a somewhat different version of the evening's events.  Ellis was a

11 federal prison inmate when he learned from a 2005 newspaper report that the investigation had

12 been reopened, and contacted detectives.  Ellis testified that he was living with his wife Margaret

13 and their children in the same apartment complex as Cloer and Messner at the time of Cloer's

14 disappearance.  He frequently gave Cloer rides to bars and other places.  He thought but was not

15 certain that he had taken Cloer and the others to the dance club that evening, and recalled waiting

16 in Cloer's apartment for her to call him to come and pick them up.  Also present in the apartment,

17 according to Ellis, were Ellis's wife and Cloer's roommate.  Ellis testified he was present when

18 Cloer and the man arrived.  According to Ellis, the man stood outside while Cloer changed her

19 clothes.  Ellis tried to engage the man in conversation and at one point even walked up to him to

20 try and shake his hand.  Ellis testified that he felt uneasy about the guy and tried to talk Cloer out

21 of leaving with him.  When Cloer and the man left, Ellis looked out a back window of the

22 apartment and saw them get into a dark blue Lincoln.  Ellis identified petitioner from a photo

23 lineup as the man who was with Cloer.

24        Margaret Ellis corroborated the fact that she and Stanley saw Cloer leave the apartment

25 building with a stranger that night.  Margaret Ellis could not identify the man.

26        Cloer's body was discovered at approximately 1:00 p.m. the following afternoon in an

27 isolated field approximately 15 to 20 miles west of Placerville.  She was lying on her back and

28 was nude except for a bra.  Cloer had sustained three gunshot wounds, one each to the head, chest

3

1   and arm.  She had also suffered such crushing blows to the head that she was unrecognizable.

2   Items of her clothing were discovered strewn about the area.  There were stains on Cloer's panties

3   that were still moist.  Officers found several .32 caliber shell casings, a .32 caliber bullet, and a

4   set of keys.  A later examination revealed a milky fluid inside the victim's vagina, but the fluid

5   contained no sperm.

6           The investigating officers later received a telephone call from a woman who said her

7   daughter, Elizabeth Ford, had a roommate who fit the description of the person found on June 19.

8   The officers met with Ford, Messner, and Chappell.  The officers also visited the Texaco station

9   where Chappell said she had first seen the man suspected of the murder.  The officers spoke with

10  the attendants and examined credit card slips for gasoline purchases the evening of the murder.

11  The officers made a list of the license plate numbers from the credit card slips.  They later ran

12  those numbers against Department of Motor Vehicle records to determine the registered owners.

13  One of the credit card slips contained license plate number DUK323.  However, the name on the

14  slip was not legible.  That number was registered to Thelma and Richard Hart and was associated

15  with a 1965 Oldsmobile convertible.  Although it was not known at the time, Thelma and Richard

16  Hart were petitioner's mother and stepfather.

17          The officers involved in the case never investigated petitioner in connection with the

18  murder.  Sometime later, petitioner was convicted of unrelated criminal offenses, including

19  solicitation to commit murder and being an accessory after the fact to murder, and a biological

20  sample was obtained from him for DNA analysis and entry into the state convicted offender

21  databank.

22          In July 2002, the Betty Cloer case was reopened and the bra and panties found at the

23  murder scene were taken to the California Department of Justice crime lab for DNA analysis.

24  Sperm cells were found on the panties, and the DNA from those cells was compared to the

25  convicted offender database.  A match was found to petitioner.  Further investigation ensued,

26  including obtaining a saliva sample from petitioner.  The DNA from that sample also matched the

27  sample from the victim's panties.

28  ////

4

1   Petitioner is six feet, four and one-half inches tall.  At the time of the offense, he was

2   married to Diana Saylor.  In 1971, petitioner and Saylor moved to a home on V Street in

3   Sacramento, which was approximately six and one-half miles from the victim's apartment.

4   Petitioner and a partner, Mark Masterson, operated a used car sales and service company located

5   on Alhambra Boulevard, approximately five and one-half miles from the victim's residence.  In

6   2003, investigating officers located and questioned Saylor, who recalled losing some keys in

7   1971.  When the officers showed her the keys that had been found at the murder scene, her eyes

8   got wide and she immediately grabbed the keys and started rubbing a stone attached to the

9   keychain.  Saylor said the keychain looked familiar to her.  At the trial, Saylor testified that the

10   key ring looked familiar and was similar to one she had in 1971, but she did not positively

11   identify it.

12   According to Saylor, she and petitioner had been driving the Oldsmobile convertible with

13   license plate number DUK323 in 1971.  The car was a light colored, two-door convertible, with

14   the convertible top the same color as the car body.  During that period, petitioner and Saylor also

15   owned and operated a Lincoln that was off-white in color.  Saylor testified that petitioner owned

16   guns in 1971 and often carried one in the car with him.  She did not remember petitioner having a

17   Texaco credit card.

18   The prosecution presented evidence regarding two prior incidents in which petitioner had

19   sexually assaulted young women, the first involving Sharon S. on December 2, 1970, and the

20   second involving Melinda M. on March 9, 1972.  Sharon S. and Melinda M. were both, like

21   Cloer, young white females who appear to have been chosen by random encounter.  Both Sharon

22   S. and Melinda M. alleged that they had agreed to go somewhere with petitioner and another man,

23   then were taken by car to a different location where they could be rendered helpless.  Petitioner

24   physically assaulted both women, and threatened to kill them.  He put a gun to Melissa M.'s head.

25   Petitioner had sexual intercourse with both women.

26   Petitioner and Mark Masterson were tried for the Sharon S. assault in 1971.  Testimony

27   from the preliminary hearing in that case, including the victim's testimony, was read into the

28   record of the instant case.  The jury also heard live witness testimony regarding the Sharon S.

5

1   case.  Mark Masterson testified that he and petitioner had both raped Sharon S. and that petitioner

2   had persuaded another employee, John Mays, to falsely testify at the 1971 trial that both men had

3   been with him at the auto shop on the night of the rape.  Petitioner and Masterson were both

4   acquitted in the Sharon S. case.

5        Petitioner had been charged in the Melinda M. matter and eventually entered a negotiated

6   plea to assault, with the sex offense charges being dropped.  Melinda M. testified at petitioner's

7   trial that he had raped her in 1972 after he and James Allen picked her up when she was

8   hitchhiking.

9        *Defense case*

10       Petitioner testified and denied murdering Betty Cloer.  Although he could not recall where

11  he had been on the evening of June 18, 1971, he testified that he had not been to the Texaco

12  station.  Petitioner acknowledged he and his wife ended up with the 1965 Oldsmobile convertible

13  with license plate number DUK323, but claimed he rarely drove it.  He testified he did not have

14  either a Texaco or a government credit card, the only types of credit cards accepted by the Texaco

15  station on Madison Avenue at the time.  Petitioner claimed he did not own a .32 caliber handgun

16  in June 1971.

17       As to why his DNA may have been found on the victim's panties, petitioner explained he

18  had been at a party sometime before July 4, 1971, at the home of Ron Williams, and was sitting

19  alone in the back yard when someone who looked like the victim came on to him and they had

20  sex in a tent.  Petitioner explained he had come to the party with a friend, Kimo.  Kimo left in

21  petitioner's truck and petitioner was waiting for Kimo to return.  When Kimo came back,

22  petitioner learned that Kimo had been in an accident and, because petitioner was distracted by this

23  incident, he never spoke to the woman again.

24       Regarding Stanley Ellis's testimony, petitioner testified he and Ellis had been in jail

25  together in 1972 and again in 1976.  Petitioner testified that in 1972 he was a jail trustee given the

26  job of hospital orderly.  Part of that job required him to go around the jail with a guard while the

27  guard picked up mail from the inmates.  Petitioner would use a pill cart and pass out aspirin, band

28  aids and other "minor" things.  In doing so, he came in contact with Ellis.  Petitioner testified that,

6

although he had seen Ellis on numerous occasions during the six to eight months petitioner had the orderly job, Ellis had never accused petitioner of being involved in the Betty Cloer murder.

Petitioner denied the Sharon S. assault, and testified that he was with his wife and/or working at the time of the alleged rape.  He denied interfering with a witness or soliciting perjury. He testified that Masterson had made comments to him during the preliminary hearing in the Sharon S. case that indicated Masterson and Sharon S. had consensual sex and that she was pregnant with Masterson's child.  Petitioner also denied sexually assaulting Melinda M.

Defense investigator Fran Trunzo testified that she and defense counsel had interviewed Ellis in federal prison on August 24, 2006.  Ellis was unable to describe the man he claimed to have seen with Cloer on the night of her murder, although he claimed that he could identify him. Ellis was unemotional in discussing Cloer.  Defense attorney Weiner did not threaten or intimidate Ellis.

*Prosecution rebuttal case*

On rebuttal the prosecution presented the testimony of James "Kimo" Hempstead, who said he had been involved in an accident in petitioner's truck on September 21, 1971, while he was driving a gunshot victim to the hospital.  Hempstead did not remember going to a party with petitioner at the home of Ron Williams, and did not recall knowing a Ron Williams.  The September 1971 incident was the only time he crashed any of petitioner's vehicles.

William Roberts, who had worked in the Sacramento County jail during 1972, testified that trustee inmates never handed out medicine to other inmates.

*Outcome*

On April 8, 2008, the jury found petitioner guilty of first degree murder.  On April 25, 2008, petitioner was sentenced to seven years to life in prison with the possibility of parole.

Post-conviction Proceedings

Petitioner timely appealed, and the California Court of Appeal for the Third Appellate District affirmed the conviction in an unpublished opinion filed December 15, 2009.  Lodged Doc. 8.  Petitioner's timely petition for review was denied by the California Supreme Court on March 25, 2010.  Lodged Doc. 9.

Petitioner filed a petition for writ of habeas corpus in the El Dorado County Superior Court on March 29, 2011.  The petition was denied on the merits in a written order filed on April 19, 2011.  Lodged Doc. 10.

On May 16, 2011, petitioner filed a petition for writ of habeas corpus in this court, together with a motion for stay and abeyance.  ECF Nos. 1, 2.  On November 14, 2011, the magistrate judge previously assigned to the case determined that the petition contained only one exhausted claim.  The unexhausted claims were dismissed without prejudice, the action was stayed, and petitioner was directed to file an amended petition within 60 days of the date the California Supreme Court denied his petition.  ECF No. 8.

Petitioner had been pursuing his state remedies since requesting the stay of this action. On June 23, 2011, petitioner filed a petition for writ of habeas corpus in the California Court of Appeal for the Third Appellate District, which was denied without comment or citation on July 14, 2011.  Lodged Doc. 11.  Petitioner filed a habeas petition in the California Supreme Court on September 13, 2011, which was denied without comment or citation on February 15, 2012. Lodged Doc. 12.

On April 16, 2012, petitioner filed a First Amended Petition in this court.  ECF No. 10. The stay was lifted and respondent was directed to respond.  ECF No. 11.  Following several extensions of time, the answer was filed on November 26, 2012.  ECF No. 29.  Petitioner's traverse was filed on February 22, 2013.

## STANDARDS GOVERNING HABEAS RELIEF UNDER THE AEDPA

28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), provides in relevant part as follows:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

1
2
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

3   The statute applies whenever the state court has denied a federal claim on its merits,

4   whether or not the state court explained its reasons.  Harrington v. Richter, 131 S. Ct. 770, 785

5   (2011).  State court rejection of a federal claim will be presumed to have been on the merits

6   absent any indication or state-law procedural principles to the contrary.  Id. at 784-785 (citing

7   Harris v. Reed, 489 U.S. 255, 265 (1989) (presumption of a merits determination when it is

8   unclear whether a decision appearing to rest on federal grounds was decided on another basis)).

9   "The presumption may be overcome when there is reason to think some other explanation for the

10  state court's decision is more likely."  Id. at 785.

11  The phrase "clearly established Federal law" in § 2254(d)(1) refers to the "governing legal

12  principle or principles" previously articulated by the Supreme Court.  Lockyer v. Andrade, 538

13  U.S. 63, 71-72 (2003).  Only Supreme Court precedent may constitute "clearly established

14  Federal law," but circuit law has persuasive value regarding what law is "clearly established" and

15  what constitutes "unreasonable application" of that law.  Duchaime v. Ducharme, 200 F.3d 597,

16  600 (9th Cir. 2000); Robinson v. Ignacio, 360 F.3d 1044, 1057 (9th Cir. 2004).  If there is no

17  Supreme Court precedent that controls a legal issue raised by a habeas petitioner in state court,

18  the state court's decision cannot be contrary to, or an unreasonable application of, clearly

19  established federal law.  Wright v. Van Patten, 552 U.S. 120, 125-26 (2008) (per curiam).

20  A state court decision is "contrary to" clearly established federal law if the decision

21  "contradicts the governing law set forth in [the Supreme Court's] cases."  Williams v. Taylor, 529

22  U.S. 362, 405 (2000).  A state court decision "unreasonably applies" federal law "if the state

23  court identifies the correct rule from [the Supreme Court's] cases but unreasonably applies it to

24  the facts of the particular state prisoner's case."  Id. at 407-08.  It is not enough that the state court

25  was incorrect in the view of the federal habeas court; the state court decision must be objectively

26  unreasonable.  Wiggins v. Smith, 539 U.S. 510, 520-21 (2003).

27  Review under § 2254(d) is limited to the record that was before the state court.  Cullen v.

28  Pinholster, 131 S. Ct. 1388, 1398 (2011).  The question at this stage is whether the state court

9

1    reasonably applied clearly established federal law to the facts before it.  Id.  In other words, the

2    focus of the § 2254(d) inquiry is "on what a state court knew and did."  Id. at 1399.  Where the

3    state court's adjudication is set forth in a reasoned opinion, §2254(d)(1) review is confined to "the

4    state court's actual reasoning" and "actual analysis."  Frantz v. Hazey, 533 F.3d 724, 738 (9th

5    Cir. 2008) (en banc).  A different rule applies where the state court rejects claims summarily,

6    without a reasoned opinion.  In Richter, supra, the Supreme Court held that when a state court

7    denies a claim on the merits but without a reasoned opinion, the federal habeas court must

8    determine what arguments or theories may have supported the state court's decision, and subject

9    those arguments or theories to § 2254(d) scrutiny.  Richter, 131 S. Ct. at 786.

10           Under California law, a summary denial of a claim "on the merits" means that the

11   California Supreme Court assumed the truth of all factual allegations asserted in support of the

12   claim, and nonetheless concluded that those facts did not state a claim entitling the petitioner to

13   relief.  People v. Duvall, 9 Cal. 4th 464, 474 (1995); People v. Romero, 8 Cal. 4th 728, 737

14   (1994).  In other words, summary denial on the merits indicates a determination that the petitioner

15   has failed to state a prima facie case.  Duvall, 9 Cal. 4th at 475; Pinholster, 131 S. Ct. at 1402

16   n.12 (citing In re Clark, 5 Cal. 4th 750, 770 (1993)).  When a state court denies a claim for failing

17   to state a prima facie case, the absence of a prima facie case is the determination that must be

18   reviewed for reasonableness under § 2254(d).  Nunes, 350 F.3d at 1054-55.

19           Relief is also available under AEDPA where the state court predicated its adjudication of

20   a claim on an unreasonable factual determination.  Miller-El v. Dretke, 545 U.S. 231, 240 (2005);

21   Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir.), cert. denied, 543 U.S. 1038 (2004).  The

22   statute explicitly limits this inquiry to the evidence that was before the state court.   28 U.S.C. §

23   2254(d)(2).

24           To prevail in federal habeas proceedings, a petitioner must establish the applicability of

25   one of the § 2254(d) exceptions and also must also affirmatively establish the constitutional

26   invalidity of his custody under pre-AEDPA standards.  Frantz v. Hazey, 533 F.3d 724 (9th Cir.

27   2008) (en banc).  There is no single prescribed order in which these two inquiries must be

28   conducted.  Id. at 736-37.  The AEDPA does not require the federal habeas court to adopt any one

10

1   methodology.  Lockyer v. Andrade, 538 U.S. 63, 71 (2003).

2                                    DISCUSSION

3       I.      Introduction

4           Due to the excessive length and complexity of petitioner's submissions, it is not possible

5   to engage in a point-by-point discussion of his arguments and theories.  The undersigned has

6   reviewed the pleadings in their entirety and has independently reviewed the entire lodged state

7   court record, and addresses below the core of each claim for relief.  Because the AEDPA bars

8   relief on each claim for the reasons explained below, petitioner's many additional arguments and

9   theories on related matters need not be addressed.

10      II.     Claims Related To Trial Counsel's Alleged Conflict(s)

11          Grounds One, Three, Five and Seven of the petition[3] involve allegations that trial counsel,

12   Dain Weiner, did not provide the conflict-free counsel that the Sixth Amendment requires.

13      A.  Petitioner's Allegations

14          1.  Overview Of The Claims

15          Petitioner identifies what he considers eight discrete "conflicts" that allegedly impaired

16   Weiner's loyalty and thus violated petitioner's rights under the Sixth Amendment.  All involve

17   counsel's pre-trial interview of witness Stanley Ellis, and the consequences of counsel's alleged

18   misconduct during that interview.  Petitioner claims that Wiener had a conflict of interest

19   because: (1) he presented a fraudulent photograph of the petitioner to Ellis; (2) he threatened Ellis

20   by showing him a newspaper article about petitioner and stating "This is what he [petitioner] does

21   to his enemies"; (3) he openly visited witness Ellis in prison, causing Ellis to be viewed as a

22   snitch; (4) he misrepresented himself as Ellis's attorney to gain a prison visit; (5) he "induc[ed] a

23   federal criminal investigation of himself in his role as petitioner's lawyer"; (6) he represented

24   petitioner in a trial where he was the chief witness; (7) he convinced petitioner to waive his right

25   to conflict-free counsel; and (8) he failed to oppose the prosecutor's request to seal the records

26   _____

27   [3] There are no Grounds Two, Four, Six or Eight in the federal petition.  In the state habeas
     petition, Grounds Two, Four, Six and Eight stated California law counterparts to Grounds One,
     Three, Five and Seven, respectively.  See Lodged Docs. 10, 12.

28

1  from the in camera hearing regarding the conflicts of interest.  See, e.g., ECF No. 10 at 21-22

2  (Table of Contents ("TOC")).

3      Ground One focuses primarily on the "fraudulent photograph," and also asserts more

4  broadly that Weiner's pretrial contact with Ellis and the aftermath of that interview deprived

5  petitioner of his right to conflict-free counsel.  Id. at 8-13 (TOC); ECF No. 10 at 86 through 10-1

6  at 26.  Ground Three alleges that petitioner's waiver of the conflict was defective and violated his

7  Sixth Amendment and due process rights.  ECF No. 10 at 18-33 (TOC); ECF No. 10-2 at 4

8  through 10-3 at 27.  Ground Five essentially restates the factual basis for Ground One, and

9  emphasizes that Weiner's performance was adversely affected by the conflict.  ECF No. 10 at 34-

10  35 (TOC); ECF No. 10-3 at 27-41.  Ground Seven restates the factual basis for Ground Three and

11  alleges that the trial court violated petitioner's rights by accepting the defective waiver.  ECF No.

12  10 at 35-36 (TOC); ECF No. 10-3 at 41-43.

13      2.  Factual and Procedural Background

14          a.  *Facts Related To The Alleged Conflict*

15      Prior to trial, defense counsel Dain Weiner and investigator Fran Trunzo interviewed

16  Stanley Ellis in prison.  5 RT at 1161, 1181-83 (testimony of Stanley Ellis).[4]  The interview took

17  place after Ellis's attorney had directly told Weiner not to speak to Ellis.  RT Aug. at 124.[5]

18  During the visit, Ellis was shown a photograph of an individual other than petitioner but labeled

19  with petitioner's name.  RT Aug. at 140; 9 RT at 2383, 2401-02 (testimony of Fran Trunzo).

20  Ellis said that the man in the photo was not the man he had seen with Betty Cloer on the night of

21  her murder.  5 RT at 1183; 9 RT at 2407.  Weiner also showed Ellis articles about petitioner.  RT

22  Aug. at 125.  Ellis felt intimidated because he was shown "this article about what Mr. Thompson

23  does to his enemies."  5 RT 1186; see also 5 RT 1205-06.

24      At a pretrial hearing on August 10, 2007, the prosecutor told the trial judge that Ellis had

25  written to Detective Fitzgerald following the Weiner visit, expressing fear for his own safety and

26

27  [4] "RT" refers to the Reporter's Transcript on Appeal, Lodged Doc. 3, Volumes 1-11.
    [5] "RT Aug." refers to the Reporter's Augmented Transcript on Appeal, Lodged Doc. 4.

28

1    requesting intervention on his behalf.  RT Aug. at 119, 122.  Ellis felt that his life was in danger

2    because Weiner's visit made him look like an informer.  5 RT 1165-66, 1169, 1188, 1208.  The

3    prosecutor raised the possibility that if Ellis were to be questioned at trial about the interview, his

4    statements to Weiner, use of the deceptive photograph, or Ellis's subsequent requests for

5    protection or leniency, Weiner would end up having to be a witness.  RT Aug. at 122-124.  The

6    prosecutor also raised the possibility that Weiner's conduct vis-à-vis Ellis could "cause some

7    negativity to be imputed to the defendant."  RT Aug. at 125.  The prosecutor suggested that

8    Weiner's conduct toward Ellis could be interpreted as witness intimidation.  RT Aug. at 126.

9          At a further hearing on October 5, 2007, the judge asked the prosecutor whether she

10    intended to pursue criminal charges against Weiner for deceiving a witness.  RT Aug. at 135

11    ("You going to file a 133 PC or not, that's the bottom line? . . .  Do you have any information as

12    to whether or not any other jurisdiction is going to file a PC 133?")[6]  The prosecutor replied that

13    she was not forwarding the information to any other jurisdiction, but sought only to resolve the

14    impact the incident would have on petitioner's trial.  RT Aug. at 135-36.  She stated that she had

15    attempted "to essentially remain neutral in this situation and just bring the information to the

16    court."  RT Aug. at 136.  The court ruled tentatively that Weiner would continue to represent

17    petitioner, Ellis could testify, and that any testimony related to Ellis's credibility would be

18    handled by Ms. Trunzo.  The judge indicated that he would take no action regarding potential

19    charges against Weiner.  RT Aug. at 136-37.

20          During further argument, the prosecutor emphasized the potential for Mr. Weiner's

21    conduct to become an issue at trial.[7]  RT Aug. at 138-44.  She characterized the Ellis visit and use

22    of the "fraudulent" photograph as "at best, inappropriate behavior.  At worst, criminal behavior,

23    unethical behavior."  RT Aug. at 141.  The prosecutor noted the potential for the case to be

24    derailed mid-trial if it became necessary for Weiner to testify.  RT Aug. at 144.  She also repeated

25

[6] Cal. Penal Code § 133 (Deceiving a witness).

26    [7] "[U]ltimately the testimony of Mr. Doe [Ellis] is anticipated that he will state that he felt like it

27    was a setup from the beginning.  He did not want to be there talking with these people.  And that
he felt intimidated, and certain things were said by Mr. Weiner to him that caused him to feel a
threat to his security. . ."  RT Aug. at 139.

28

1  the concern that the jury's knowledge of "shady behavior" by defense counsel would impair

2  petitioner's right to a fair trial.  RT Aug. at 141.  She predicted that even with a waiver of

3  conflict, "[w]e can see the appeal coming."  RT Aug. at 142.

4              b.  *Facts Related To The Waiver Of Potential Conflict*

5         At the October 5, 2007 hearing the judge addressed petitioner as follows:

6              . . . Mr. Thompson, it has been your repeated request that Mr.
              Weiner remain as your attorney of record.  I am more than willing
7              to substitute counsel because of this issue in this matter, but, you
              know, Ms. Kelliher makes a valid point.  When the jury sees what
8              they may perceive to be shenanigans or skullduggery on the part of
              your defense team, I would say not only possibly are they going to
9              attribute that to you, if they determine that it was some sort of
              chicanery, they will attribute it to you.  That's the bottom line.  But
10             you have repeatedly indicated that you want Mr. Weiner and Ms.
              Trunzo to remain as your defense team in this matter so I'll leave it
11             to you.

12  RT Aug. at 142.

13         Petitioner responded, "As I told Mr. Weiner, I'll wager his credibility against [Ellis's]

14  credibility any day of the week."  RT Aug. at 142.

15         The following waiver colloquy ensued:

16             THE COURT: All right. Mr. Thompson, you have an absolute right
              to conflict free counsel. All right. That is an absolute right that you
17             have, but that can be waived. All right. And what I need to know
              from you, and I must understand, you know, you are making a
18             knowing and intelligent waiver with sufficient awareness of the
              relevant circumstances and the likely consequences. That's the
19             language from the Supreme Court of the potential conflict or the
              conflict in this case. I need to know that you and Mr. Weiner have
20             discussed the potential drawbacks of his representation. Now, you
              said earlier you would stack Mr. Weiner's credibility against Mr.
21             Doe's credibility any day of the week. If he represents you as an
              attorney, he's not going to have that opportunity. He's not going to
22             be taking the stand and testifying in front of the jury as your
              attorney presenting the case, you need to understand that. That if I
23             leave him as your counsel of record, it will not be him on the stand
              versus Mr. Doe on the stand. Okay. You understand that?
24
              [PETITIONER]: Uh-huh.
25
              THE COURT: Is that a yes?
26
              [PETITIONER]: Yes, I do.
27
              THE COURT: All right. And that means that there may be issues
28             that come up during the trial that would, I'll say under ordinary

14

circumstances, require that Mr. Weiner be called as a witness in this matter. That will be prohibited because he is representing you. And that can have ramifications and this is just – for an example, if Mr. Doe says something on the stand that only Mr. Weiner can rebut through his testimony, he will not be able to do that because if I leave him as your counsel of record, he is going to be prohibited from taking the stand. He cannot be a witness and present the case. So you understand that there is that potential?

[PETITIONER]: I do.

THE COURT: All right. That means that that may have an adverse effect on the information that Mr. Doe imparts to the jury, trier of fact, the people that will be deciding your fate in this matter, and that can be a potential deleterious effect on you and your case. And you understand that? And what I mean by that is it can put Mr. Weiner at a disadvantage in arguing the case, and in his argument attacking Mr. Doe's credibility in his final summation. And there are, you know, perhaps even until we hear Mr. Doe, there may be consequences that I can't even foresee that would have a bad impact on your case. But because Mr. Weiner is your attorney and he is prohibited from testifying, you may not be able to counter those. You understand that?

[PETITIONER]: Yes.

THE COURT: All right. And, you know, like I say, you have that right to the conflict free representation, and I need to know that having discussed all of these matters – well, let me ask this question first; have you discussed these possible consequences with Mr. Weiner?

[PETITIONER]: Yes.

THE COURT: All right. Having discussed them with Mr. Weiner, having me talk about them on the record, and I have to make sure you clearly understand the ramifications of your waiver, and that, you know, you have to make – I have to make sure that, you know, you're going into this with your eyes wide open and that this is your choice. And you have to know that I would be more than willing to appoint another attorney for you and it would be an experienced attorney. I have one in mind. I have one in mind when you came in here this morning, if I were to relieve Mr. Weiner, he has a lot of experience and, in fact, I believe he was involved with this case earlier on. Not to hide the ball, Mr. Clark was who I have in mind, Mr. Jim Clark to represent you. He's got a lot of experience trying cases and in this community. And so I need to know you're going into this with your eyes wide open, understanding all the possible bad effects this could have and I would appoint you another attorney, a very experienced attorney in his matter that is free of any conflicts and it's still your desire that Mr. Weiner represent you?

[PETITIONER]: Yes.

15

1    THE COURT: Okay. Do you have any questions of me concerning
     this representation or how it may affect your case?

2

     [PETITIONER]: I don't.

3

4    RT Aug. at 145-47.

5        The judge clarified further, "When I say you may not be able to respond to testimony by

6    Mr. Doe, what I mean and what [the prosecutor] is indicating, it may go unrebutted. There may

7    not be anyone to say him nay, if you will." RT Aug. at 148.  Petitioner responded, "I understand

8    all the ramifications, your Honor, and I still waive the issue." RT Aug. at 148-49.  The judge

9    repeated in stronger terms the possibility that Ellis's testimony might go to the jury completely

10   unrebutted if both Weiner and Trunzo were unable to testify because of potential criminal liability

11   and/or conflict.  Petitioner repeated that he understood and waived any conflict.  RT Aug. at 149-

12   50.

13       The prosecutor argued that Weiner should be removed despite the waiver.  RT Aug. at

14   150-51.  The court, however, accepted the waiver:

15            THE COURT: [T]he Court would indicate that it has sufficient
              information to and evidence or argument before it to replace Mr.
16            Weiner.  And to be candid, that would be my choice in this matter
              to relieve this issue. But the Court must balance the potential here –
17            and as far as, I mean, not the potential, but the interests here of Mr.
              Thompson in keeping his appointed counsel with whom he has
18            developed a relationship, attorney-client relationship with, and the,
              I'll say, potential of a conflict here. And as long as Mr. Thompson
19            is fully apprised and goes into it with his eyes wide open, the Court
              does not see this as rising to the degree that would make it
20            mandatory for the Court to replace the attorney based on what I
              know so far.

21

22   RT Aug. at 151-52.

23       B.  The Clearly Established Federal Law

24       It is well established that the Sixth Amendment right to effective assistance of counsel

25   carries with it "a correlative right to representation that is free from conflicts of interest."  Wood

26   v. Georgia, 450 U.S. 261, 271 (1981).  Accordingly, a trial court may not require over objection

27   that one lawyer simultaneously represent co-defendants with actually conflicting interests.

28   Holloway v. Arkansas, 435 U.S. 475 (1978).  In such cases, prejudice is presumed and reversal is

1    required.  Id. at 488-90.  Where there is no objection to joint representation, a different rule

2    applies.  In order to establish a Sixth Amendment violation, a defendant who raised no objection

3    at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's

4    performance.  Cuyler v. Sullivan, 446 U.S. 335, 348 (1980).  This is a lesser showing than

5    probable effect on the outcome of the trial.  Id. at 349-350 ("a defendant who shows that a

6    conflict of interest actually affected the adequacy of his representation need not demonstrate

7    prejudice in order to obtain relief."); Mickens v. Taylor, 535 U.S. 162,172-173 (2002).  "Actual

8    conflict of interest" means a conflict that actually affects counsel's performance, rather than a

9    "mere theoretical division of loyalties."  Mickens, 535 U.S. at 171.

10          Conflicts of counsel may be waived.  Wood, 450 U.S. at 273-74.  A trial court need not

11   accept a proffered waiver, however, and may insist that defendants be represented by unconflicted

12   counsel.  Wheat v. United States, 486 U.S. 153, 162 (1988).  Trial courts are permitted broad

13   latitude to decide whether or not to accept waivers of conflicts.  Id. at 63.  The validity of a

14   waiver of conflict is governed by the standard applicable to waivers of other fundamental rights.

15   Glasser v. United States, 315 U.S. 60, 70 (1942) (waivers of right to unconflicted counsel are

16   governed by Johnson v. Zerbst, 304 U.S. 458, 464 (1938)).  The question is whether, in light of

17   all the relevant facts and circumstances, the waiver was knowing, intelligent and voluntary:

> A   waiver   is   ordinarily   an   intentional   relinquishment   or
> abandonment of a known right or privilege. The determination of
> whether there has been an intelligent waiver of the right to counsel
> must depend, in each case, upon the particular facts and
> circumstances surrounding that case, including the background,
> experience, and conduct of the accused.

22   Johnson v. Zerbst, 304 U.S. at 464.

23          C.  The State Court's Ruling

24          Because the California Supreme Court denied all claims without comment or citation,

25   Lodged Doc. 12, this court "looks through" the silent denial to the last reasoned state court

26   decision.  See Ylst v. Nunnemaker, 501 U.S. 797 (1991).  The El Dorado Superior Court denied

27   the conflicted counsel claims in a reasoned order, so that is the decision reviewed for

28   reasonableness under § 2254(d).  See Bonner v. Carey, 425 F.3d 1145, 1148 n.13 (9th Cir. 2005).

17

The superior court ruled as follows:

> It has long been held that the initial burden for *habeas* relief is on petitioner. He must: "…plead adequate grounds for relief by petition , which should state fully and with particularity the facts on which relief is sought and include copies of reasonably available documentary evidence supporting the claim, including pertinent portions of transcripts and affidavits or declarations. Conclusory allegations made without any explanation of the basis for the allegations do not warrant relief, let alone an evidentiary hearing. (*People v. Duvall* (1995) 9 Cal.4th 464, 474.)

> Also, in general, it has long been held that *habeas writ* may not serve as a substitute for an appeal. (*People v. Lempia* (1956) 144 Cal.App.2d 393, 398.) Likewise, *habeas corpus* is not an available remedy to review the rulings of the trial court with respect to the admission or exclusion of evidence, or to correct other errors of procedure occurring on the trial. (*Ex parte Lindley* (1947) 29 Cal.2d 709, 723.)

> Finally, the general rule is that habeas corpus cannot serve as a substitute for an appeal, and: "… in the absence of special circumstances constituting an excuse for failure to employ that remedy, the writ will not lie where the claimed errors could have been, but were not, raised upon a timely appeal from a judgment of conviction. (Citations)." (*Ex parte Dixon* (1953) 41 Cal.2d 756, 759.)

> Applying these principles, the court addresses each ground set forth in the petition.

> Ground One.   The petitioner alleges that there was a conflict of interest between himself and trial counsel. This issue was addressed at the trial of this matter. The petitioner's own documents show that it was. Further, this issue was not raised on appeal even after appellate counsel sought and received sealed documents on this issue during the course of the appeal. The petitioner simply dresses the same evidence and issues in a new package, but raises nothing new in this petition. . . .

> Ground Three.   The petitioner alleges his waiver of conflict free counsel was unconstitutional. Petitioner's own documents show that he was fully informed of the conflict and waived that conflict. His self-serving statements to the contrary do not support the petition. Likewise, this ground fails for the reason set forth above for Ground One. . . .

> Ground Five.   The allegations in this ground are, essentially the same as Ground Three and Four, and fail for the same reasons. . . .

> Ground Seven.   The petitioner alleges that the court should have exercised its inherent powers to remove counsel because of the conflict. This ground fails for the same reason as Grounds Three, Four, Five, and Six. In addition, as set forth in petitioner's own documentation, the court balanced the petitioner's right to the

18

counsel of his choice against the waived conflict and kept counsel
in the case at petitioner's own request.

Lodged Doc. 10 at 2-4.

The superior court further ruled that "the petition fails to state a prima facie claim as to any basis for relief. . ." Id. at 6.

D.  Procedural Default

Respondent argues that Ground One is procedurally barred because it was denied by the superior court on the ground that it could have, but was not, raised on appeal as required by Lempia and Lindley, supra.  ECF No. 29 at 25-28.  As a general rule, a federal habeas court "will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment."  Calderon v. United States District Court (Bean), 96 F.3d 1126, 1129 (9th Cir.1996) (citing Coleman v. Thompson, 501 U.S. 722, 729 (1991)); cert. denied, 520 U.S. 1204 (1997). The fact that the state court alternatively ruled on the merits, see Lodged Doc. 10 at 6, does not erase the effect of a procedural bar.  Harris v. Reed, 489 U.S. 255, 264 n. 10 (1989).

A petitioner can overcome a procedural default by demonstrating cause and prejudice. Coleman v. Thompson, 501 U.S. 722, 753 (1991).  Here, petitioner presents multiple theories why the procedural default doctrine does not apply, and extensive briefing on the issue.  ECF No. 10 at 13-18 (TOC to Petition, outlining arguments); ECF No. 10-1 at 26 through 10-2 at 4 (Petition); ECF No. 34 at 34-38 (Traverse).  Among other things, petitioner alleges that his appellate counsel performed ineffectively, in violation of his constitutional rights, by failing to raise on appeal those issues presented to the state courts for the first time in habeas.  See ECF No. 34 at 36-37 (Traverse); ECF No. 10-4 at 60-73 (Petition, Ground Twenty (ineffective assistance of appellate counsel)).

Ineffective assistance of counsel ("IAC") can, if pleaded and proved, establish cause for a default.  Murray v. Carrier, 477 U.S. 478, 488 (1986); Edwards v. Carpenter, 529 U.S. 446, 451 (2000).  The cause and prejudice inquiry applicable to Ground One overlaps with the merits of petitioner's appellate IAC claim at Ground Twenty.  In both the default and merits contexts,

19

1  petitioner must establish prejudice from appellate counsel's performance, which in turn requires

2  analysis of the strength of the claims that counsel failed to present on appeal.  See Moorman v.

3  Ryan, 628 F.3d 1102, 1106-07 (9th Cir. 2010), cert. denied, 132 S.Ct. 346 (2011).

4       A procedural default may also be overcome with proof of actual innocence.  Schlup v.

5  Delo, 513 U.S. 298 (1995); House v. Bell, 547 U.S. 518 (2006).  Plaintiff here has asserted actual

6  innocence as a ground to overcome default, ECF No. 34 at 37, and has also presented a putative

7  freestanding claim of actual innocence as grounds for relief, ECF No. 10-3 at 43-45 (Ground

8  Nine).  In this context as well, the analysis related to default overlaps with (if it is not identical to)

9  review of the merits of a separate claim that is not defaulted.

10       A federal court may bypass consideration of a procedural bar issue in the interests of

11  judicial economy, where the asserted default presents complicated questions and the other issues

12  are resolvable against the petitioner.  Lambrix v. Singletary, 520 U.S. 518, 522−25 (1997);

13  Franklin v. Johnson, 290 F.3d 1223, 1232 (9th Cir. 2002).  Here, because the merits of the

14  defaulted issues and of petitioner's actual innocence claim must be evaluated in any case, and

15  because petitioner's discussion of default would be difficult and excessively time-consuming to

16  address, the undersigned exercises discretion to bypass the procedural default issue and proceed

17  to the merits.

18       E.  Objective Unreasonableness Under 28 U.S.C. § 2254(d)

19         1.  *Grounds One And Five: Violation of Right To Conflict-Free Counsel*

20       The superior court ruled that plaintiff had not established a prima facie case of the denial

21  of conflict-free counsel.  Lodged Doc. 10 at 6.  That conclusion did not involve an unreasonable

22  application of clearly established federal law.  No U.S. Supreme Court case holds that it violates

23  the Sixth Amendment for a lawyer accused of misconduct vis-à-vis a witness to continue to

24  represent a criminal defendant at trial.  Moreover, the Supreme Court specifically noted in

25  Mickens, supra, that the application of Cuyler v. Sullivan to circumstances other than the active

26  legal representation of defendants with conflicting legal interests is not clearly established.

27  Mickens, 535 U.S. at 174-75 (noting that lower courts' broad application of Sullivan to other

28  types of attorney "conflict" is not clearly established or even supported by Sullivan itself).

1  Because Weiner did not represent both petitioner and Ellis, <u>Sullivan</u> and progeny do not govern

2  as a matter of clearly established law and therefore cannot have been unreasonably applied. <u>See</u>

3  <u>Wright v. Van Patten</u>, 552 U.S. at 125-26 (where no Supreme Court precedent controls the issue,

4  state courts' decision cannot be contrary to, or an unreasonable application of, clearly established

5  federal law).

6      Even if the <u>Sullivan</u> standard did apply to the type of conflict at issue here, the claim

7  would fail because the record does not support a finding that Weiner's performance was

8  adversely affected by his interest in protecting himself from accusations of misconduct. <u>See</u>

9  <u>Sullivan</u>, 446 U.S. at 349-50 (actual conflict of interests exists if adequacy of representation is

10  affected by divided loyalty); <u>Mickens</u>, 535 U.S. at 71 (same). Weiner vigorously cross-examined

11  Ellis and attacked his credibility. Weiner did not shy away from the facts of what happened

12  during the prison interview. Rather, he directly attacked Ellis's version of those events. Weiner's

13  cross-examination challenged Ellis's claim to have been intimidated by Weiner, and implied that

14  Ellis had made up a story about being threatened in order to obtain a favorable transfer.

15  Throughout the lengthy cross-examination, contrary to petitioner's representations, there is no

16  hint of pulled punches. <u>See</u> 5 RT 1202-92. Weiner also presented the testimony of Fran Trunzo

17  to rebut Ellis's account of the interview. 9 RT 2375-2401. In light of these facts, it was not

18  objectively unreasonable for the superior court to find that petitioner had not presented a prima

19  facie case of conflicted counsel. No actual conflict can reasonably be found on this record.[8]

20  _____

21  [8] Contrary to petitioner's rhetoric, Weiner did not become a witness at the trial and was not the
    subject of a federal criminal investigation. The trial judge had been understandably concerned

22  about the prospect of criminal charges and the possibility that Weiner might have to testify, but
    neither circumstance came to pass. Petitioner also contends inaccurately that Weiner "admitted"

23  threatening Ellis. There was no admission. Weiner's closing argument regarding Ellis's
    accusation drips with sarcasm even from the cold transcript page: "Now, Mr. Ellis, you recall, is

24  the federal prison inmate who I went in and threatened and intimidated. . . . Special Investigative
    Services came to talk to him about this terrible, evil lawyer, wanting to know how I had gotten

25  into the prison, how I had gotten in to interview him." 11 RT 2777. Weiner continued: "[Ellis]
    described for you this interview that took place with the SIS agent. Luckily, we had a court order,

26  ordering the federal prison system to produce any such report, and you know what? . . . There
    was no report, because it never happened, but it's certainly a stellar example of Mr. Ellis's ability

27  to make up a story. . . He testified that as a result of the visit. . . [h]e was at risk of being killed or

28  (continued…)

21

1    Petitioner contends that the trial court's ruling regarding the photograph shown to Ellis

2    rested on unreasonable determinations of fact within the meaning of 28 U.S.C. §2254(d)(2).  The

3    order denying habeas relief on this ground made no factual findings, but ruled that petitioner had

4    not established a prima facie case of a constitutional violation.  To the extent that petitioner is

5    attacking the pre-trial ruling that permitted Weiner to continue as counsel, that ruling did not turn

6    on resolution of any disputed facts regarding Weiner 's conduct in relation to Ellis.  The only

7    factual findings that supported the ruling were those related to the validity of petitioner's waiver.

8    The court now turns to that issue.

9              2.   *Grounds Three And Seven: Waiver Of Potential Conflict*

10   The superior court ruled that petitioner had not stated a prima facie case for relief on

11   grounds that his waiver of conflict-free counsel was defective.  That conclusion was not

12   objectively unreasonable.  It is clearly established that a conflict can be waived, <u>Wood v. Georgia</u>,

13   450 U.S. at 273-74, and that a trial court enjoys broad discretion whether to permit waiver, <u>Wheat</u>

14   <u>v. United States</u>, 486 U.S. at 63.  Exercises of discretion are entitled to great deference on habeas

15   review, because the range of reasonable state court judgments is particularly broad where the

16   standard to be applied is broad.  <u>See</u> <u>Renico v. Lett</u>, 559 U.S. 766, 776 (2010).  No Supreme

17   Court case holds that a waiver may not be accepted on facts analogous to those presented here.

18   The waiver colloquy at the pretrial hearing more than adequately satisfied the requirements of

19   <u>Johnson v. Zerbst</u>, 304 U.S. at 464.  Petitioner repeatedly insisted that Weiner not be replaced,

20   and indicated that he understood the potential for Weiner's self-interest to conflict with his

21   zealous representation of petitioner.  The trial judge bent over backwards to protect petitioner's

22   rights in this situation.  No facts or circumstances of record suggest that petitioner was less than

23   competent, that he failed to understand the rights he was waiving, or that his relinquishment of

24   those rights was involuntary or improperly influenced.  Accordingly, the state court's denial of

25

26   hurt for being a prison snitch.  And he was so concerned for his safety, he was so threatened and
     intimated, that he waited seven months to write a letter to the D.A.'s office asking if he could
27   maybe be moved somewhere else.  Seven months.  He was that scared, that frightened, that
     intimidated."  11 RT 2777-78.
28

1   the claim involved neither an unreasonable application of federal law nor an unreasonable

2   determination of fact.

3       III.    Actual Innocence

4           A.  Petitioner's Allegations

5           In Ground Nine, petitioner alleges that he is actually innocent of Betty Cloer's murder.  In

6   support of this claim, he submits two affidavits from John Doe (aka John Prokop), who petitioner

7   describes as an eyewitness to Stanley Ellis's murder of Betty Cloer.  ECF No. 10 at 36 (TOC);

8   ECF No. 10-3 at 43-45.

9           In an undated and unsigned affidavit submitted as petitioner's Exhibit A, John Doe

10  declares that he and Stan Ellis frequently committed burglaries together in the Sacramento area in

11  1971, when John Doe was a teenager.  On the night of July 18, 1971, John Doe witnessed Ellis

12  arguing with Betty Cloer outside the apartment building where both Ellis and Cloer lived.  Prior

13  to the argument with Ellis, Betty had been talking to a man in a dark blue car.  After Betty went

14  inside to get her coat, her argument with Ellis continued in John Doe's stolen van.  John Doe

15  heard a gunshot coming from the van.  Ellis then took the van keys from Doe and drove away,

16  after admitting that he had "accidentally" shot Betty.  Weeks later, Doe found Betty's purse in the

17  van.  Petitioner's Ex. A.[9]

18          In an affidavit dated September 8, 2011, John Prokop declares that he is the John Doe who

19  swore the previous affidavit.  He adds the fact that in late June 1971, Ellis admitted killing Betty

20  Cloer and threatened to have Prokop killed if he said anything to the police.  ECF No. 10-8 at 4-5.

21          Petitioner further alleges that state authorities have suppressed exculpatory evidence by

22  failing to disclose evidence related to Prokop and Ellis after having been served with the

23

24  _____

    [9] The ECF version of the petition and exhibits, which had to be scanned and filed as multiple
25  attachments due to their size, has the appendices out of order and possibly incomplete.  Because
    this court's review is limited to the record that was before the state court, and the exhibits that
26  were submitted to the California Supreme Court are part of the state court record that has been
    lodged in this case, any clerical error regarding petitioner's exhibits is without consequence.
27  Exhibit A is most readily accessible as attached to petitioner's California Supreme Court petition,
    Lodged Doc. 12.
28

1    affidavits.  ECF No. 10 at 36 (TOC); ECF No. 10-3 at 45-49.

2                    B.   The Clearly Established Federal Law

3                        1.   Actual Innocence

4          In Herrera v. Collins, 506 U.S. 390, 417 (1993), the U.S. Supreme Court assumed without

5    deciding that a truly persuasive showing of actual innocence would make the execution of a

6    capital defendant unconstitutional and would support federal habeas relief as to the death

7    sentence.  The threshold showing for such an assumed right not to be executed while innocent

8    "would necessarily be extraordinarily high."  Id.  The Supreme Court has also recognized an

9    actual innocence exception to procedural rules that would otherwise bar federal habeas review of

10   independent substantive claims.  In order to qualify for this exception, a petitioner must produce

11   "new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness

12   accounts, or critical physical evidence – that was not presented at trial."  Schlup v. Delo, 513 U.S.

13   298, 324 (1995).  Procedural default or untimeliness will only be excused where it is more likely

14   than not that no reasonable juror would have convicted petitioner in the light of the new evidence.

15   Id. at 329 (procedural default); McQuiggin v. Perkins, 133 S. Ct. 1924, 1928 (2013) (statute of

16   limitations).

17                        2.   Brady Violation

18         A Brady violation has three components:  "[t]he evidence at issue must be favorable to the

19   accused, either because it is exculpatory, or because it is impeaching; that evidence must have

20   been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."

21   Strickler v. Greene, 527 U.S. 263, 281-82 (1999) (citing Brady v. Maryland, 373 U.S. 83 (1963));

22   see also Banks v. Dretke, 540 U.S. 668, 691 (2004).  In order to establish prejudice, petitioner

23   must demonstrate that "'there is a reasonable probability' that the result of the trial would have

24   been different if the suppressed documents had been disclosed to the defense."  Strickler, 527

25   U.S. at 289.  "'The question is not whether the [petitioner] would more likely than not have

26   received a different verdict with the evidence, but whether in its absence he received a fair trial,

27   understood as a trial resulting in a verdict worthy of confidence.'"  Id. (quoting Kyles v. Whitley,

28   514 U.S. at 434).  Once the materiality of the suppressed evidence is established, no further

                                                    24

1    harmless error analysis is required.  Kyles, 514 U.S. at 435-36.

2            C.   The State Court's Ruling

3            Because the California Supreme Court denied the petition without comment, this court

4    looks through to the written decision of the superior court.  See Bonner v. Carey, 425 F.3d at

5    1148 n.13.  That court ruled as follows:

> The petitioner alleges that he is "actually innocent" based on the
> declaration of "John Doe" and that his conviction should be
> reversed.  First, the declaration is insufficient on its face.  It
> purports to be the declaration of "John Doe."  The petition is so
> patently unreliable that it cannot overcome the petitioner's heavy
> burden to overcome the presumed "…truth, accuracy, and fairness
> of the conviction and sentence."  (*People v. Duvall*, *supra*, at p.
> 474.)
>
> Further, the petitioner offers no explanation as to why the
> declaration is only just now come to light.  This ground fails for
> these reasons.

13   Lodged Doc. 10 at 4.

14           D.   Objective Unreasonableness Under 28 U.S.C. § 2254(d)

15           The California courts' denial of this claim cannot be disturbed under § 2254(d), because

16   the U.S. Supreme Court has never clearly established that a freestanding claim of actual

17   innocence exists.  See Dist. Attorney's Office v. Osborne, 557 U.S. 52, 70 (2009) (it remains an

18   open question whether there exists a federal constitutional right to release upon a showing of

19   actual innocence); see also Wright v. Van Patten, 552 U.S. at 125-26 (where no Supreme Court

20   precedent controls the issue, state courts' decision cannot be contrary to, or an unreasonable

21   application of, clearly established federal law).

22           Even if there were a clearly established right to habeas relief on a showing of actual

23   innocence, it would require the production of "new reliable evidence."  Schlup, 513 U.S. at 324.

24   The John Doe and John Prokop declarations are not "trustworthy eyewitness accounts" within the

25   meaning of Schlup.  See id.  Affidavits produced years after a trial are inherently suspect.

26   Herrera, 506 U.S. at 417-18.  The John Doe affidavit is particularly unreliable because it is

27   undated, unsigned, and does not identify the affiant.  The superior court's rejection of this

28   affidavit on those grounds was perfectly reasonable.

1    The 2011 Prokop declaration, which adopts the earlier affidavit and explains that Prokop

2    had been threatened forty years prior by Ellis, fails to overcome the credibility problems

3    necessarily presented by a defense witness who emerges at the eleventh hour.  See Herrera, 506

4    U.S. at 417-18.  The undersigned notes that this declaration was not before the superior court.  It

5    is unclear that it was properly presented to or considered by the California Supreme Court.[10]

6    Even if the California Supreme Court considered the 2011 declaration, its summary rejection of

7    the claim was not unreasonable because actual innocence analysis requires evaluation of

8    proffered declarations in light of the proof of petitioner's guilt at trial.  Herrera, 506 U.S. at 418.

9    Here, the evidence at trial pointed strongly to petitioner's guilt.  DNA matching

10   petitioner's was found on the victim's panties, and expert testimony established the negligible

11   possibility that it had come from anyone else;[11] his explanation for its presence was not

12   credible;[12] the car that he drove had been at the gas station where the victim met the man she

13

14   [10] The actual innocence claim submitted to the California Supreme Court relies exclusively on the initial John Doe affidavit.  Lodged Doc. 12 at p. 197 (actual innocence allegations).  The petition

15   in this court alleges that the 2011 Prokop declaration was submitted to the state supreme court in Appendix 5.  ECF No. 10-3 at 46. The California Supreme Court docket for petitioner's habeas

16   case reflects the submission of an Appendix 5, and accompanying motion, after the petition in that case had been filed.  Lodged Doc. 12.  The docket does not reflect any ruling on the motion.

17   In California habeas practice, "[t]he court will determine the appropriate disposition of a petition for writ of habeas corpus based on the allegations of the petition *as originally filed* and any

18   amended or supplemental petition *for which leave to file has been granted*."  In re Clark, 5 Cal.

19   4th 750, 781 n. 16 (1993) (emphasis added).  Because the allegations of the state petition as originally filed were limited to the Doe declaration, and because the California Supreme Court

20   did not grant leave to supplement or amend that petition, it appears that the 2011 Prokop declaration was not part of the record considered by the state court.

21   [11] The state's expert witness calculated the probability that a random, unrelated individual would

22   possess petitioner's DNA profile at one in 300 trillion for African-Americans, one in 220 trillion for Caucasians, and one in 270 trillion for Hispanics.  3 RT 696.  Under California law, this

23   powerfully incriminating statistical evidence is sufficient without more to support the verdict. See People v. Xiong, 215 Cal. App. 4th 1259 (2013).

24   [12] Petitioner testified that he had consensual sex with a woman resembling Cloer at a party on an unspecified date some time before her murder.  In order to accept this explanation, the jurors

25   would have to believe that Cloer wore the same panties, unwashed, on a later date to go out to a club with friends – and that by a strange coincidence, the same stranger with whom petitioner had

26   spontaneous sex at a party turned up at the same gas station as petitioner on the night she died.

27   Moreover, petitioner's testimony regarding the circumstances of the party was effectively rebutted.

28

26

disappeared with on the night of her murder; he matched eyewitness descriptions of that man; and his then-wife appeared to recognize keys that were found at the murder scene.  When all the evidence, old and new, is considered together, House v. Bell, 547 U.S. 518, 538 (2006), it cannot be said that *no* reasonable juror would find petitioner guilty.  The Prokop testimony would add another credibility contest to the mix, to be sure, but it would not compel a different result in light of the evidentiary record as a whole.  A reasonable juror might well conclude that if Stanley Ellis had killed Betty Cloer as Prokop alleges, he would have preferred to remain unconnected to the case and would not have come forward as a witness in 2005.  Accordingly, the state court's rejection of this claim was not objectively unreasonable even if an actual innocence claim presents a cognizable basis for relief.

The related Brady claim fails because petitioner identifies no material exculpatory evidence that was suppressed.  Without such a showing there is no prima facie case of a constitutional violation.  See Strickler v. Greene, 527 U.S. at 281-82 (explaining elements of Brady claim); Jones v. Gomez, 66 F.3d 199, 204-05 & n.1 (9th Cir. 1995) (conclusory allegations unsupported by statement of specific facts insufficient to support habeas relief), cert. denied, 517 U.S. 1143 (1996).  Petitioner argues that state authorities were obliged to investigate and develop exculpatory evidence in response to his post-conviction submission of the John Doe and Prokop affidavits, but no clearly established federal law establishes a right to habeas relief on that basis.  Moreover, the affidavits are so facially unreliable that they give rise to no duty to investigate.  The state courts' summary rejection of this claim was not objectively unreasonable.

IV.    Prosecutorial Misconduct

A. Petitioner's Allegations

In Ground Eleven, petitioner alleges that the trial prosecutor committed misconduct by (1) failing to refer defense counsel's conflicts of interest to a neutral prosecutor; (2) misunderstanding and misstating the law; and (3) denigrating defense counsel in closing argument.  ECF No. 10 at 36-38 (TOC); ECF No. 10-3 at 49-57.  The facts related to the alleged conflict of interest have been set forth above.  The allegation regarding mistakes of law involves the prosecutor's position at the pretrial hearing about Weiner's conduct vis-à-vis Stanley Ellis and

1    the potential conflict of interest.  Petitioner alleges that the prosecutor incorrectly led him to

2    believe that Weiner's conduct was not serious enough to refer for prosecution and therefore not

3    serious enough to pose a conflict of interest.  The alleged denigration of defense counsel refers to

4    the prosecutor's closing argument regarding Ellis's identification of petitioner, in which the

5    prosecutor pointed out that Ellis had not been tricked into a misidentification.  The prosecutor

6    stated that "Stanley was right about . . . the fact that he was being messed with" by Weiner and

7    Trunzo.  10 RT 2804.

8            In Ground Thirty-One, petitioner alleges that the prosecutor wrongfully presented the

9    false testimony of Stanley Ellis.  ECF No. 10 at 55-56 (TOC); ECF No. 10-5 at 41-42.  This claim

10   relies on the same factual basis as petitioner's actual innocence claim.  Id.

11           B.  The Clearly Established Federal Law

12           A prosecutor's improper statements violate the constitution only where they "so infect[]

13   the trial with unfairness as to make the resulting conviction a denial of due process."  Darden v.

14   Wainwright, 477 U.S. 168, 181 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643

15   (1974) (internal quotation marks omitted)).  It is not enough that the remarks were "undesirable or

16   even universally condemned."  Darden, 477 U.S. at 181.  Fundamental fairness must be assessed

17   in context of the trial as a whole, including the weight of the evidence, the defense opportunity to

18   respond, and the instructions given to the jury.  Id. at 181-82.

19           The knowing presentation of perjured testimony by the prosecution violates due process.

20   Napue v. Illinois, 360 U.S. 264, 269 (1959); Giglio v. United States, 405 U.S. 150, 153 (1972)

21   ("deliberate deception of a court and jurors by the presentation of known false evidence is

22   incompatible with [the] rudimentary demands of justice.").

23           C.  The State Court's Ruling

24           Ground Eleven was adjudicated by the superior court as follows:

25                   These grounds are simply an argument that there was prosecutorial
                     misconduct.   They do not state even a *prima facie* case for
26                   prosecutorial misconduct.  They do not raise any new issues or facts
                     and so they fail for those reasons as well as those set forth above.
27

28   Lodged Doc. 10 at 4-5.

1    Ground Thirty-One (the <u>Napue</u> claim) was not presented to the superior court.  Because

2    the California Supreme Court denied the claim without comment or citation, this court asks

3    whether there is any reasonable basis for the state court's decision.  <u>Harrington v. Richter</u>, 131 S.

4    Ct. at 786.

5              D.  <u>Objective Unreasonableness Under 28 U.S.C. § 2254(d)</u>

6              The superior court's adjudication of Claim Eleven did not involve an unreasonable

7    application of federal law.  The prosecutor's position regarding the possible conflict of interest

8    did not render the trial fundamentally unfair.  The prosecutor did not purport to be advising

9    petitioner of his rights, and petitioner cannot reasonably have taken her failure to press criminal

10   charges against Weiner as a legal opinion that there was no conflict – especially in light of the

11   prosecutor's argument that the trial court should not to accept petitioner's waiver.[13]  The closing

12   argument to which petitioner objects was nothing more than permissible comment on the

13   evidence.  Saying that Ellis was "messed with" by Weiner and Trunzo, in the context of

14   discussing Ellis's credibility, is dramatically less inflammatory than calling a defendant an

15   "animal" as in <u>Darden</u>, <u>supra</u>.  The Supreme Court in <u>Darden</u> found no due process violation

16   despite an improper comment because the evidence against the petitioner was substantial and the

17   jury was properly instructed that the arguments of counsel are not evidence.  <u>Darden</u>, 477 U.S. at

18   181-83.  The same is true here.  Even if the challenged comment were improper, there would be

19   no due process violation.

20             Petitioner's <u>Napue</u> claim fails because petitioner did not present the state court with

21   credible evidence that Ellis's testimony was actually false.  For the reasons previously explained,

22   the John Doe and Prokop affidavits lack plausible exculpatory value.  At most, they create a

23   credibility dispute.  Moreover, because the affidavits post-date the trial they do not support a

24   finding that the prosecutor knowingly presented false testimony.  Without facts demonstrating

25   that the prosecutor knew Ellis's testimony as false at the time he testified, there is no prima facie

26   case of a <u>Napue</u> violation.  <u>See</u> <u>Hein v. Sullivan</u>, 601 F.3d 897, 908 (9th Cir. 2010) (to prevail,

27   _____

[13] <u>See</u> RT Aug. at 150-51.

28

1    petitioner must show that (1) the testimony was actually false, (2) the prosecutor knew or should

2    have known the testimony was actually false, and (3) the testimony was material), cert. denied,

3    131 S.Ct. 2093 (2011).  For these reasons, the state court did not unreasonably find facts or

4    unreasonably apply federal law in summarily dismissing this claim without further development.

5           V.      Judicial Bias

6                  A.  Petitioner's Allegations

7           In Ground Thirteen, petitioner alleges: (1) that the trial judge was a former Chief Assistant

8    District Attorney in El Dorado County who had previously supervised the detective who

9    conducted the DNA cold hit investigation into the Cloer murder; (2) that petitioner's

10   constitutional rights were violated by having the trial judge rule on his state habeas petition; (3)

11   that the judge failed to advise the trial prosecutor to refer Weiner and Trunzo for prosecution; (4)

12   that the judge mishandled the waiver of conflict-free counsel because of his bias against

13   petitioner; and (5) that the judge failed to take necessary corrective action in light of the conflicts.

14   ECF No. 10 at 38-39 (TOC); ECF No. 10-3 at 57-71.

15                 B.  The Clearly Established Federal Law

16          It is clearly established that due process requires a fair trial in a fair tribunal.  In re

17   Murchison, 349 U.S. 133, 136 (1955).  It is equally well established that to prevail on a claim of

18   judicial bias a petitioner must plead and prove facts sufficient to "overcome a presumption of

19   honesty and integrity in those serving as adjudicators."  Withrow v. Larkin, 421 U.S. 35, 47

20   (1975).  There is no constitutional violation without a showing of facts that objectively

21   demonstrate a serious risk of actual bias.  See Caperton v. A.T. Massey Coal Co., Inc., 556 U.S.

22   868, 883-84 (2009).

23                 C.  The State Court's Ruling

24          The superior court ruled that petitioner's allegations "do not state even a prima facie case

25   of judicial misconduct."  Lodged Doc. 10 at 5.

26                 D.  Objective Unreasonableness Under 28 U.S.C. § 2254(d)

27          The record is devoid of facts that objectively demonstrate a serious risk of actual judicial

28   bias.  See Caperton, 556 U.S. at 883-84.  Petitioner has presented no facts indicating that the trial

1  judge was personally involved in the investigation of the Cloer murder. Even assuming that the

2  judge, in his previous capacity as a prosecutor, had worked with (or "supervised") law

3  enforcement personnel who were involved in this case, there are no indications that he was

4  affected by those relationships in his handling of this case. There are no facts suggesting that the

5  judge was biased against petitioner on the basis of the trial in a way that affected adjudication of

6  the habeas petition. Finally, the judge's handling of the potential conflict between petitioner and

7  Weiner does not reflect any bias against petitioner on the part of the judge. Because petitioner's

8  judicial bias claim lacks support in the record, it was not unreasonably rejected.

9      VI.    Admission of Uncharged Misconduct

10         A.  Petitioner's Allegations

11       Evidence of two prior rapes was admitted against petitioner under Cal. Evid. Code §

12 1101(b). As previously noted, petitioner and Mark Masterson had been tried for and acquitted of

13 the rape of Sharon S. At petitioner's trial for Betty Cloer's murder, Masterson testified that he

14 and petitioner had raped Sharon S. and that petitioner had persuaded a co-worker to provide false

15 alibi testimony. The prosecutor also presented the preliminary hearing testimony of several

16 witnesses from the Sharon S. case, including the victim.[14]

17       In Ground Fifteen, petitioner alleges that his rights to due process and to confront the

18 witnesses against him were violated by admission at trial of preliminary hearing testimony from

19 the Sharon S. preliminary hearing and all evidence of the two prior rapes. ECF No. 10 at 39

20 (TOC); ECF No. 10-3 at 71-75. This claim is duplicative of Ground Twenty-Four, which collects

21 all grounds for relief that petitioner exhausted on direct appeal. In Ground Twenty-Four

22 petitioner contends that (1) evidence of the two prior sex-offense cases was admitted in violation

23

24  ――――――――――――――
[14] Because the trial ended in acquittal, there was no appeal and no Reporter's Transcript had ever

25  been prepared. The court reporter had destroyed his notes. Accordingly, the preliminary hearing transcript was the only available record of testimony from this case. The transcript entered into

26  evidence at petitioner's trial for the Cloer murder was the transcript of the first preliminary hearing in the Sharon S. rape case. A motion to dismiss had been granted following that hearing

27  and a second preliminary hearing was held, but the transcript of the second hearing was lost. See 1 RT 35-39.

28

1   of his due process rights; (2) admission of the Sharon S. preliminary hearing testimony violated

2   his confrontation rights; (3) admission of any and all evidence related to the Sharon S. case

3   violated his protection against double jeopardy; (4) CALCRIM No. 375, regarding consideration

4   of uncharged conduct, is unconstitutional.  ECF No. 10 at 54 (TOC); ECF No. 10-5 at 36-39.

5                  B.   The Clearly Established Federal Law

6          Errors of state law do not present constitutional claims cognizable in habeas.  Pulley v.

7   Harris, 465 U.S. 37, 41 (1984).  The erroneous admission of evidence only violates due process if

8   the evidence is so irrelevant and prejudicial that it renders the trial as a whole fundamentally

9   unfair.  Estelle v. McGuire, 502 U.S. 62 (1991).  Erroneous jury instructions do not support

10  federal habeas relief unless the infirm instruction so infected the entire trial that the resulting

11  conviction violates due process.  Id. at 72 (citing Cupp v. Naughten, 414 U.S. 141, 147 (1973)).

12  See also Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974) ("'[I]t must be established not

13  merely that the instruction is undesirable, erroneous, or even 'universally condemned,' but that it

14  violated some [constitutional right]'").  The challenged instruction may not be judged in artificial

15  isolation, but must be considered in the context of the instructions as a whole and the trial record

16  overall.  Estelle, 502 U.S. at 72.  Moreover, relief is only available if there is a reasonable

17  likelihood that the jury has applied the challenged instruction in a way that violates the

18  Constitution.  Id. at 72–73.

19         The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall

20  enjoy the right to . . . be confronted with the witnesses against him."  The Confrontation Clause

21  prohibits the admission of testimonial out-of-court statements by non-testifying individuals.

22  Crawford v. Washington, 541 U.S. 36 (2004).  Not all hearsay implicates the core concerns of the

23  Confrontation Clause; the dispositive question is whether the statement is "testimonial."

24  Crawford, 541 U.S. at 51.  Confrontation Clause violations are subject to harmless error analysis

25  under Chapman v. California, 386 U.S. 18 (1967).  Delaware v. Van Arsdall, 475 U.S. 673, 684

26  (1986).

27         The Double Jeopardy Clause of the Fifth Amendment, as applied to the states by the

28  Fourteenth Amendment, prohibits retrial following acquittal.  Benton v. Maryland, 395 U.S. 784

1   (1969); Tibbs v. Florida, 457 U.S. 31, 41 (1982).  The Double Jeopardy Clause also incorporates

2   principles of collateral estoppel, and precludes the government from relitigating issues that were

3   decided by a prior acquittal.  Ashe v. Swenson, 397 U.S. 463 (1970).  The prohibition against

4   double jeopardy does not prohibit the introduction of evidence of acquitted conduct in a

5   subsequent trial on different charges, if the question whether the defendant committed the first

6   crime is governed by a lower standard of proof in the trial for the second crime.  Dowling v.

7   United States, 493 U.S. 342, 348-49 (1990).

8                    C.  The State Court's Ruling

9        These issues were raised on direct appeal.  Because the California Supreme Court denied

10  discretionary review, the decision of the California Court of Appeal constitutes the last reasoned

11  decision on the merits.  See Ylst, 501 U.S. 797; Ortiz v. Yates, 704 F.3d 1026, 1034 (9th Cir.

12  2012).

13       The appellate court first ruled that the prior crimes evidence was admissible under

14  California law.  Lodged Doc. 8 at 18-21.  The court then held that "any error in admitting the

15  evidence was harmless in light of the overwhelming evidence against defendant."  Id. at 21.  The

16  court's detailed discussion of that evidence, and of the inherent incredibility of petitioner's trial

17  testimony and defense theory, need not be quoted here in full.  See id. at 22-25.  The court noted

18  that petitioner's federal due process argument was governed by the Chapman standard of

19  harmlessness beyond a reasonable doubt.  Id. at 26 (citing Chapman v. California, 386 U.S. 18

20  (1967)).  The court concluded that "any error in admitting the uncharged [or acquitted] offense

21  evidence was harmless beyond a reasonable doubt."  Id. at 27.

22       The appellate court next held that the Confrontation Clause was not violated by admission

23  of preliminary hearing testimony from the Sharon S. case.  Sharon S. was deceased at the time of

24  petitioner's trial and therefore unavailable.  The court held that Crawford, supra, did not bar use

25  of her prior testimony because the witness was unavailable and petitioner had an adequate

26  opportunity to cross-examine her at the preliminary hearing.  Although limits had been placed on

27  the scope of defense questioning at the preliminary hearing, which resulted in a second

28  preliminary hearing, those limits did not make the cross-examination of Sharon S. inadequate for

1  purposes of Crawford.  Id. at 28-32.

2        The appellate court held that the admission of acquitted conduct evidence did not violate

3  the prohibition against double jeopardy, relying on Dowling v. United States, supra, 493 U.S. at

4  353-54.  Id. at 33.

5        Finally, the appellate court rejected petitioner's constitutional challenge to CALCRIM No.

6  375, relying on People v. Reliford, 29 Cal. 4th 1007 (2003).  Id. at 37.

7              D.  Objective Unreasonableness Under 28 U.S.C. § 2254(d)

8        The California Court of Appeal did not unreasonably apply clearly established federal law

9  in rejecting petitioner's due process challenge to the evidence of prior rapes.  The court applied

10  the correct Chapman harmless error standard.  The conclusion that any error was harmless beyond

11  a reasonable doubt is not objectively unreasonable.  The volume and weight of evidence pointing

12  to petitioner's guilt was overwhelming, including the DNA evidence;[15] petitioner's patently

13  incredible explanation for the presence of his DNA on Cloer's panties;[16] the presence of his car at

14  the gas station where Cloer met the man with whom she was last seen before her murder; and the

15  fact that petitioner's ex-wife appeared to recognize the keys found at the murder scene.

16  Moreover, admission of the other crimes evidence did not render petitioner's trial fundamentally

17  unfair.  See Estelle, 502 U.S. at 72.  Petitioner had ample opportunity to counter the rape

18  evidence, and the jury was properly instructed regarding the limited purposes for which it could

19  be considered.

20        The California Court of Appeal also reasonably concluded that admission of Sharon S.'s

21  preliminary hearing testimony did not violate petitioner's confrontation rights.  The U.S. Supreme

22  Court noted in Crawford itself that admission of the prior cross-examined testimony of an

23

24  [15] See People v. Xiong, 215 Cal. App. 4th 1259 (2013) (DNA evidence sufficient to support murder verdict in "cold-hit" case).

25  [16] Petitioner testified that he had consensual sex with a woman resembling Cloer at a party on an unspecified date before her murder.  His testimony regarding the party was effectively rebutted.

26  Moreover, no juror could reasonably believe that Cloer would have been wearing the same unwashed panties days later.  Cloer's roommate testified that she bathed daily and always wore

27  clean clothes.  Petitioner's testimony was riddled with credibility problems.  The state court's evaluation of this evidence, Lodged Doc. 8 at 22-23 & 26-27, is well reasoned.

28

1   unavailable witness does not implicate the Confrontation Clause.  Crawford, 541 U.S. at 59; see

2   also Mattox v. United States, 156 U.S. 237 (1895) (prior testimony of deceased witness not

3   inadmissible under Confrontation Clause); Barber v. Page, 390 U.S. 719, 725-26 (1968)

4   (recognizing exception to the confrontation requirement for the prior testimony of an unavailable

5   witness); California v. Green, 399 U.S. 149, 165 (1970) (preliminary hearing testimony

6   admissible because fully subject to cross-examination at preliminary hearing).

7        This court need not delve into the weeds of petitioner's arguments that flaws in the first

8   Sharon S. preliminary hearing render his prior opportunity for cross-examination inadequate to

9   support the exception.  Any confrontation error would be subject to harmless error analysis.  Van

10   Arsdall, 475 U.S. at 684.  Even if Sharon S.'s prior testimony was barred by the Confrontation

11   Clause, Mark Masterson's live testimony would have fully supported a jury finding that petitioner

12   had raped Sharon S.  Accordingly, any error was harmless.

13        The state court did not expressly address petitioner's confrontation theory as it relates to

14   the preliminary hearing testimony of additional witnesses from the Sharon S. case.  Because that

15   testimony can have had no conceivable impact on the jury, particularly in light of Masterson's in-

16   court testimony admitting to the rape and directly inculpating petitioner, any error was harmless.[17]

17   See Van Arsdall, 475 U.S. at 684.  Accordingly, the state courts' unexplained rejection of the

18   claim cannot have been objectively unreasonable.

19        Petitioner's double jeopardy theory is squarely foreclosed by Dowling, supra, 493 U.S. at

20   348-49.  Dowling clearly establishes that the Double Jeopardy Clause does not prohibit the use of

21   acquitted conduct evidence for purposes other than direct criminal liability for that conduct,

22   where the question whether the defendant committed the first crime is governed by a lower

23   standard of proof.  In light of Dowling, habeas relief is not available.  In Charles v. Hickman, 228

24   F.3d 981 (9th Cir. 2000), the Ninth Circuit rejected a double jeopardy claim with citation to

25   Dowling where, as here, evidence of acquitted conduct was admitted to prove a prior bad act

26

27   _____
    [17] The additional witnesses testified to circumstantial matters such as where and when they had
    seen petitioner on the night of the Sharon S. rape.

28

                                        35

1   under Cal. Evid. Code § 1101(b).  The state court's reliance on <u>Dowling</u> was not unreasonable, as

2   <u>Charles</u> demonstrates.

3          Finally, the state appellate court's rejection of petitioner's challenge to CALCRIM 375

4   involved no unreasonable application of federal law.[18]  The state court relied on <u>People v.</u>

5   <u>Reliford</u>, 29 Cal. 4th 1007 (2003), which upheld a similar jury instruction specific to

6   consideration of prior sex offenses in sex offense cases.[19]  The Ninth Circuit has specifically held

7   that <u>Reliford</u> is consistent with clearly established federal law.  <u>Schultz v. Tilton</u>, 659 F.3d 941,

8   945 (9th Cir. 2011), <u>cert. denied</u>, 132 S.Ct. 2436 (2012).  Moreover, there is no reasonable

9   likelihood that the jury in petitioner's case applied the challenged instruction in a way that

10  violates the Constitution.  <u>See</u> <u>Estelle</u>, 502 U.S. at 72–73.  The instructions as a whole clearly

11  explained the distinct burdens of proof that applied to the prior acts and to the murder charges,

12  and the permissible and impermissible uses of the prior acts evidence.  <u>See</u> 10 RT 2663-65.

13  Petitioner's jury was specifically instructed:

14              If you conclude that the defendant committed the uncharged
             offenses, that conclusion is only one factor to consider, along with
15           all the other evidence. It is not sufficient by itself to prove that the
             defendant is guilty of murder. The People must still prove each
16           element of the charge beyond a reasonable doubt.

17  _____

18  [18] The jury was instructed pursuant to CALCRIM No. 375 as follows:  "The People presented
    evidence that the defendant committed other offenses that were not charged in this case. You may
19  consider this evidence only if the People have proved by a preponderance of the evidence that the
    defendant in fact committed the uncharged offenses.  Proof by a preponderance of the evidence is
20  a different burden of proof than proof beyond a reasonable doubt.  A fact is proved by a
    preponderance of the evidence if you conclude that it is more likely than not that the fact is true."
21  10 RT 2663-64.

22  [19] Unlike the instruction challenged here, the instruction at issue in <u>Reliford</u> (CALJIC No.
    2.50.01) expressly permitted an inference of propensity to commit the charged offense based on a
23  finding by a preponderance of evidence that the defendant had committed a prior offense.
    Accordingly, that instruction is significantly more problematic than CALCRIM 375.  Petitioner's
24  jury was not instructed that it could draw a propensity inference; it was affirmatively instructed
    not to do so.  10 RT 2664 ("Do not conclude from this evidence that the defendant . . . is disposed
25  to commit crime.").  Petitioner's jury was instructed that it could consider the prior conduct – if
    proved by a preponderance of the evidence – for the limited purpose of determining intent,
26  motive, or plan.  10 RT 2664.  Whether the evidence was properly admitted on any of those
    theories is a question of state law that this court may not disturb.  <u>See</u> <u>Lewis v. Jeffers</u>, 497 U.S.
27  764, 780 (1990) (federal habeas corpus relief does not lie for errors of state law).

28

1   10 RT 2664-65.  This language cures any arguable burden shifting effect the instruction might

2   otherwise have.  Schultz, 659 F.3d at 943-45.  Accordingly, the state court's rejection of this

3   claim may not be disturbed.

4        To the extent if any that petitioner's Ground 15 presents any additional constitutional

5   objections to the prior rape evidence that were not addressed and decided on appeal, the summary

6   rejection of those objections by the state habeas courts was not unreasonable.[20]  The U.S Supreme

7   Court has never held that jury consideration of propensity evidence violates the constitution.  See

8   Alberni v. McDaniel, 458 F.3d 860, 866 (9th Cir. 2006) (not clearly established that admission of

9   propensity evidence violates due process), cert. denied, 549 U.S. 1287 (2007).  Accordingly, a

10  state prisoner may not obtain habeas relief under the AEDPA on grounds that prejudicial prior

11  crimes evidence was admitted at trial.  Id.; see also Mejia v. Garcia, 534 F.3d 1036 (9th Cir.

12  2008) (habeas relief unavailable where evidence of prior sexual assault admitted at trial), cert.

13  denied, 555 U.S. 1117 (2009); Larson v. Palamteer, 515 F.3d 1057, 1066 (9th Cir.) (habeas relief

14  unavailable where evidence of petitioner's past criminal conduct admitted at trial), cert. denied,

15  555 U.S. 871 (2008).

16       For all the reasons explained above, 28 U.S.C. § 2254(d) bars relief on all claims related

17  to the evidence of prior rapes.

18       VII.    Exclusion Of Third-Party Culpability Evidence

19            A.  Petitioner's Allegations

20       In Grounds Sixteen and Twenty-Five, petitioner alleges that his right to present a defense

21  was violated by the exclusion of third-party culpability evidence.  ECF No. 10 at 39 (TOC re:

22  Ground 16); ECF No. 10-3 at 75-76; (Ground 16) ECF No. 10 at 54-55 (TOC re: Ground 25);

23  ECF No. 10-5 at 39 (Ground 25).  Specifically, he claims that the trial court refused to admit

24  evidence that (1) the "American River rapist" committed the murder; (2) Betty Cloer was an

25  [20] The superior court inaccurately characterized Ground 15 as presenting a judicial misconduct

26  claim, and denied it for failure to state a prima facie case.  Lodged Doc. 10 at 5.  No higher state
    court stated reasons for denial of habeas relief.  Accordingly, this court asks whether there is any

27  reasonable basis for the state court's decision.  Harrington v. Richter, 131 S. Ct. at 786.  Under
    any standard of review, the claim fails for the reasons explained above.

28

1   informant in Oregon regarding drug dealing, and had feared a drug dealer would kill her; (3) "a

2   deranged person first suspected by the El Dorado Sheriff" committed the murder; (4) another

3   male whose "DNA faction was found on the victim's panties" committed the murder; (5) Stanley

4   Ellis committed the murder.  ECF No. 10-3 at 76.  Petitioner does not identify where in the record

5   the defense proffered and the trial court excluded evidence to support any of these third-party

6   culpability theories.

7            B.  The Clearly Established Federal Law

8            The Constitution guarantees to criminal defendants the right to present a defense.

9   Chambers v. Mississippi, 410 U.S. 284 (1973); Crane v. Kentucky, 476 U.S. 683, 690 (1986).

10  This includes the right to present reliable evidence that another person committed the charged

11  crime.  Holmes v. South Carolina, 547 U.S. 319 (2006).  State rules establishing standards for the

12  admissibility of third-party culpability evidence are constitutionally permissible as long as they

13  are rationally related to the legitimate purpose of excluding evidence that has only a weak logical

14  connection to the central issues at trial.  Id. at 326-30.

15           C.  The State Court's Ruling

16           The superior court denied this claim on grounds that it did "not state even a *prima facie*

17  case of judicial misconduct."  Lodged Doc. 10 at 5.  Although the court arguably misconstrued

18  the substance of the claim,[21] the standard that governs an entirely unexplained denial of relief also

19  focuses on the absence of a prima facie case.  See Pinholster, 131 S.Ct. at 1402 (California

20  summary denial indicates determination petitioner failed to state a prima facie case); Nunes, 350

21  F.3d at 1054-55 (absence of prima facie case is determination reviewed for reasonableness under

22  AEDPA).

23           D.  Objective Unreasonableness Under 28 U.S.C. § 2254(d)

24           It was not unreasonable of the state courts to summarily reject this claim.  Petitioner

25  identifies five third-party culpability theories, but fails to identify any specific evidence in support

26

27  _____
    [21] On the other hand, the court may have used the phrase "judicial misconduct" loosely to mean
    violation of petitioner's constitutional rights by the trial court.

28

1   of any of those theories that was proffered to and excluded by the trial court.[22]   Conclusory

2   allegations without supporting facts are insufficient to support habeas relief.  James v. Borg, 24

3   F.3d 20, 26 (9th Cir.), cert. denied, 513 U.S. 935 (1994).  Without factual allegations specifying

4   evidence of third-culpability that was wrongfully excluded from his trial, petitioner failed to

5   present a prima facie case of a constitutional violation.  Accordingly, § 2254(d) precludes relief.

6          The undersigned has independently reviewed the trial record and finds that it fails to

7   support the conclusory allegations of the petition.  First, Stanley Ellis testified and was cross-

8   examined about his knowledge of Cloer's disappearance.  The defense aggressively attacked

9   Ellis's credibility, but did not seek to implicate him in the murder.  The only evidence against

10  Ellis in the current record is the Prokop declaration.  Prokop did not come forward at the time of

11  petitioner's trial, and his testimony regarding Ellis's involvement and alleged confession was

12  neither proffered to nor excluded by the trial court.

13         Regarding the DNA evidence, plaintiff alleges that third part culpability was "supported

14  by ample DNA evidence obtained through re-testing and presented at trial by Attorney Robert

15  Blasier."  ECF No. 10-3 at 76.  Robert Blasier, an attorney well-known for his work regarding

16  DNA evidence, was brought in by the defense to cross-examine prosecution witness Angelynn

17  Shaw, the state's forensic DNA analyst.  3 RT 554 et seq.  Blasier challenged Ms. Shaw's

18  methodology and attempted to discredit her conclusion that the DNA on the victims' panties

19  came from petitioner.  3 RT 710-790.  The defense did not present its own DNA expert or any

20  independent test results that affirmatively pointed to a perpetrator other than petitioner.  The trial

21  court never excluded any such evidence.  Blasier was not limited in his questioning of Ms. Shaw

22

23  [22] Under California law, a criminal defendant has a right to present evidence of third party
     culpability if that evidence is capable of raising a reasonable doubt regarding his own guilt.  See
24  Spivey v. Rocha, 194 F.3d 971, 978 (9th Cir. 1999) (citing People v. Hall, 41 Cal. 3d 826, 833
     (1986)).  In order for evidence pointing to another suspect to be admissible, however, "there must
25  be direct or circumstantial evidence linking the third person to the actual perpetration of the
     crime."  Hall, 41 Cal. 3d at 833.  Motive or opportunity alone is not enough.  Spivey, 194 F.3d at
26  978 (citing Hall, 41 Cal. 3d at 833).  There is no constitutional violation in the application of
     these standards unless they are applied arbitrarily or in a manner disproportionate to the reliability
27  purposes they are designed to serve.  See Holmes, 547 U.S. at 326-27.

28

1    regarding the possibility that someone other than petitioner left DNA on the victim's panties.

2         The record reflects the existence of a pretrial dispute regarding reports that Betty Cloer

3    had informed on others in Oregon and had feared reprisal.  The prosecution moved in limine to

4    exclude any such testimony.  6 CT 1757-68.[23]  Briefing on the motion reflects that the

5    information was limited to hearsay reports from Cloer's sister and roommate about Cloer's

6    statements to them.  6 CT 1762 (prosecution version), 8 CT 2158 (defense version).  Further

7    investigation, including contact with Oregon law enforcement officials, revealed no evidence that

8    Cloer had been an informant.  6 CT 1762-64.  The trial court accordingly granted the prosecution

9    motion to exclude, without prejudice to revisiting the issue if specific evidence of third-party

10   culpability was presented.  8 CT 2195.[24]  The defense never offered additional evidence to

11   support the theory that Cloer had been murdered in retaliation for informant activity.  Petitioner

12   identifies no such evidence.  43

13        Regarding the "American River rapist" and the unknown "deranged person" allegations,

14   pre-trial motions reflect defense concern about various investigative leads that had been explored

15   in 1971 and seemed to point to alternative suspects.  See, e.g., 8 CT 2129-31 (defense motion to

16   dismiss based on pre-accusation delay) & 2153-56 (1971 investigation report discussing a person

17   of interest who resembled composite sketch of the "American River Rapist").  The record does

18   not reflect, however, that any third-party culpability evidence of this type was actually offered

19   and was ruled inadmissible at trial.

20        Because none of the third-party culpability theories suggested by petitioner was the

21   subject of a trial court ruling excluding evidence, the state courts did not act unreasonably in

22   rejecting this claim for failing to state a prima facie case.

23   ////

24   _____

25   [23] "CT" refers to the Clerk's Transcript on Appeal.
     [24] Because rumors that Cloer had been an informant do not constitute evidence linking a third
26   person to the actual perpetration of the crime, the hearsay reports about Cloer's informant activity
     were inadmissible under state law.  See People v. Hall, 41 Cal. 3d at 833.  For the same reason, it
27   was not unreasonable for the state courts to conclude that exclusion of this evidence did not
     impair petitioner's right to present a defense.

28

1    VIII.   Ineffective Assistance Of Trial Counsel

2          A.   Petitioner's Allegations

3          In Ground Nineteen, petitioner alleges that trial counsel Dain Weiner provided ineffective

4    assistance of counsel by failing to object to the constitutional errors alleged elsewhere in the

5    petition.  ECF No. 10 at 48-50 (TOC); ECF No. 10-4 at 41-59.

6          In petitioner's cumulative error claim, Ground Twenty-One, petitioner contends *inter alia*

7    that Weiner rendered ineffective assistance by failing to request a jury instruction on the defense

8    theory of the case and by failing to conduct an adequate investigation before deciding whether to

9    present an alibi defense.  ECF No. 10 at 50-53 (TOC); ECF No. 10-5 at 6-7.

10         In Ground Thirty-Four, petitioner alleges that Weiner rendered ineffective assistance by

11   failing to present the testimony of DNA expert Keith Peterson Inman.  Petitioner alleges that

12   Inman would have testified that: (1) male DNA other than petitioner's was found on the panties at

13   the crime scene; (2) "peaks in the DNA charts" reflect that the DOJ lab results implicating

14   petitioner were unreliable; (3) the DNA samples were contaminated, and therefore unreliable; (4)

15   the re-testing of the sample by the same criminalist was improper and created the possibility of

16   biased results.  ECF No. 10 at 65-68 (TOC); ECF No. 10-5 at 82-84.

17         B.   The Clearly Established Federal Law

18         To establish a constitutional violation based on ineffective assistance of counsel, a

19   petitioner must show (1) that counsel's representation fell below an objective standard of

20   reasonableness, and (2) that counsel's deficient performance prejudiced the defense.  Strickland v.

21   Washington, 466 U.S. 668, 692, 694 (1984).  Objectively reasonable performance includes the

22   "duty to make reasonable investigations or to make a reasonable decision that makes particular

23   investigations unnecessary."  Id. at 691.  Prejudice means that the error actually had an adverse

24   effect on the defense.  There must be a reasonable probability that, but for counsel's errors, the

25   result of the proceeding would have been different.  Id. at 693-94.  The court need not address

26   both prongs of the Strickland test if the petitioner's showing is insufficient as to one prong.  Id. at

27   697.  "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient

28   prejudice, which we expect will often be so, that course should be followed."  Id.

41

1          C.   The State Court's Ruling

2          The superior court summarily denied the umbrella claim that Weiner was ineffective in

3    failing to object to or prevent the other alleged constitutional violations.  Lodged Doc. 10 at 5

4    (denying Ground 19 for failure to state a prima facie case and failing to raise any new facts or

5    issues).  The California Supreme Court denied the petition containing petitioner's additional

6    ineffective assistance claims without comment or citation.  Lodged Doc. 12.  Accordingly, the

7    absence of a prima facie Strickland case is the determination subject to review under AEDPA.

8    See Pinholster, 131 S.Ct. at 1402; Nunes, 350 F.3d at 1054-55.

9          D.   Objective Unreasonableness Under 28 U.S.C. § 2254(d)

10         Because petitioner's ineffective assistance claims all fail as a matter of law for lack of

11   prejudice, it was not unreasonable of the state courts to deny them summarily.  Ground 19 fails

12   because it merely recasts in ineffective counsel terms other claims that are meritless for reasons

13   explained elsewhere in these Findings and Recommendations.  Ground Twenty-One fails because

14   jury instructions on the "defense theory" cannot conceivably have made a difference in light of

15   the evidence against petitioner.[25]  The bare allegation that Weiner failed to investigate adequately

16   before rejecting an alibi defense cannot support a viable Strickland claim, because petitioner fails

17   to allege any facts specifying what evidence was available that would likely have changed the

18   result of the trial.  See ECF No. 10-5 at 6-7.  See Hendricks v. Calderon, 70 F.3d 1032, 1042

19   (1995) ("Absent an account of what beneficial evidence investigation into any of these issues

20   would have turned up, [petitioner] cannot meet the prejudice prong of the Strickland test.").

21         In support of his DNA-related claim, petitioner attaches the curriculum vitae of Keith

22   Peterson Inman (Petitioner's Ex. BB, Item 2[26]), but he includes no documentation to support his

23   assertion that Inman would have provided exculpatory testimony at petitioner's trial if called as a

24

25   [25] Petitioner faults Weiner for not requesting a jury instruction "that [petitioner] had a type of
     alibi to explain the possible presence of DNA on the victim's panties, in that his DNA might have
26   been on the victim Ms. Cloer's panties because he believed he might have had sex with her days
     prior to her death, and she did not clean her clothes."  ECF No. 10-5 at 6.
27   [26] Petitioner's exhibits are most readily accessible as part of Lodged Doc. 12, attached to the
     habeas petition submitted to the California Supreme Court.
28

42

1  witness.  Petitioner's allegations reflect no more than a wish that his lawyer had been able to

2  come up with an expert who could rebut the testimony of the state's expert DNA witness.  Indeed,

3  petitioner states that Weiner decided not to call Inman because his testimony would have added

4  nothing to the points made on cross-examination of the state's expert.  ECF No. 10-5 at 82-83.[27]

5  Petitioner states no facts suggesting that Inman would have provided testimony that could have

6  affected the verdict.  See Grisby v. Blodgett, 130 F.3d 365, 373 (9th Cir. 1997) ("Speculation

7  about what [a witness] could have said is not enough to establish prejudice.")

8      Because petitioner's allegations do not establish a prima facie claim under Strickland, the

9  state court's denial of relief was both reasonable and correct.

10      IX.    Ineffective Assistance Of Appellate Counsel

11      A.  Petitioner's Allegations

12      In Ground Twenty, petitioner alleges that his appellate counsel rendered ineffective

13  assistance by (1) failing to present on appeal the record-based claims of the petition; (2) failing to

14  raise on appeal trial counsel's ineffectiveness; (3) failing to augment the record on appeal with

15  complete transcripts of jury voir dire; and (4) failing to interview jurors regarding their

16  deliberations.  ECF No. 10 at 49-50 (TOC); ECF No. 10-4 at 60-73.

17      B.  The Clearly Established Federal Law

18      A criminal defendant enjoys the right to effective assistance of counsel on appeal.  Evitts

19  v. Lucey, 469 U.S. 387, 391 (1985).  The Strickland framework applies to claims that this right

20  has been violated.  Smith v. Robbins, 528 U.S. 259, 285 (2000).  To demonstrate prejudice,

21  petitioner must show a reasonable probability that he would have prevailed on appeal absent

22  counsel's errors.  Id. at 285-86.

23      C.  The State Court's Ruling

24      The superior court ruled as follows:

25          [A]s to the allegations of the ineffective assistance of appellate
   counsel, petitioner apparently confuses tactics with ineffectiveness.

26

27  [27] Blasier cross-examined the state's DNA expert about the four topics that petitioner identifies as requiring testimony from Inman.  See 3 RT 711-90 (cross-examination of Angelynn Shaw).

28

1
2
3

> The petitioner's has the burden of proving counsel's conduct fell short of a reasonably competent attorney acting as a diligent advocate. (*Strickland v. Washington* (1984) 466 U.S. 668, 686.) He has not made even a *prima facie* showing of this.

4

D. Objective Unreasonableness Under 28 U.S.C. § 2254(d)

5   The state court's ruling was reasonable.  For the reasons explained elsewhere in these

6  Findings and Recommendations, none of the issues omitted from the appeal and raised in habeas

7  had the potential to result in a reversal of petitioner's conviction.  Petitioner identifies no

8  meritorious appellate issue regarding jury selection.  Because jury deliberations are not matters of

9  record that can be raised on appeal, appellate counsel cannot have been derelict in failing to

10  investigate.  Without a showing of any meritorious appellate issue that would have been

11  discovered and presented absent the alleged errors, there is no prima facie case of ineffectiveness

12  on appeal.  See Smith v. Robbins, 528 U.S. at 285-86; see also Smith v. Murray, 477 U.S. 527,

13  536 (1986) (winnowing out weak arguments on appeal is hallmark of effective advocacy, not

14  indicator of ineffectiveness).

15   X.   Admission Of Threat Evidence

16    A. Petitioner's Allegations

17   In Ground Seventeen, petitioner alleges that due process was violated by admission of

18  evidence that witness Stanley Ellis had been threatened by defense counsel Weiner.  ECF No. 10

19  at 40 (TOC); ECF No. 10-3 at 76-77.  Petitioner focuses on Ellis's testimony that Weiner showed

20  him a newspaper article about "what Thompson does to his enemies," and that Ellis felt

21  threatened by information about him being available on the internet.

22    B. The Clearly Established Federal Law

23   The erroneous admission of evidence only violates due process if the evidence is so

24  irrelevant and prejudicial that it renders the trial as a whole fundamentally unfair.  Estelle v.

25  McGuire, 502 U.S. 62.

26    C. The State Court's Ruling

27   The superior court denied this claim, together with others, on grounds that it did "not state

28  even a *prima facie* case of judicial misconduct."  Lodged Doc. 10 at 5.  Whether the superior

1    court meant "no *prima facie* case of trial court error" or misconstrued the claim, the determination

2    subject to AEDPA remains the absence of a prima facie case.  See Pinholster, 131 S.Ct. at 1402;

3    Nunes, 350 F.3d at 1054-55.

4                        D.  Objective Unreasonableness Under 28 U.S.C. § 2254(d)

5            The record does not support a finding of fundamental unfairness.  Stanley Ellis testified

6    that Weiner visited him in prison and showed him "several articles that was taken off the internet

7    and a picture."  5 RT 1182.  On cross-examination, Ellis elaborated that Weiner "[s]howed me an

8    article and said this is an article on what Mr. Thompson does to his enemies."  5 RT 1202.  Ellis

9    did not know what was in the article; he did not read it because he did not have his glasses.  Id.

10   No article about "what Mr. Thompson does to his enemies" was in evidence.  Ellis also testified

11   that he felt endangered by the fact that information about his involvement in the case was

12   available on the internet.  5 RT 1175.  There was no suggestion that information was posted on

13   online by the defense, however.

14           The defense vigorously attacked Ellis's credibility, including the veracity of his account of

15   the Weiner interview.  Weiner argued that Ellis interjected himself into the case in order to obtain

16   sentencing and housing benefits.  The defense mocked Ellis's claims to have been intimidated,

17   see 11 RT 2777-78 (defense closing argument), and used those claims against him.  The trial

18   court did not in any way limit the defense in this regard.

19           Under these circumstances, the state court did not unreasonably apply federal law in

20   finding no prime facie case of fundamental unfairness.  Under any standard, this claim would fail.

21   XI.     Unconstitutional Sealing Of Records

22                        A.  Petitioner's Allegations

23           In Grounds Eighteen, Twenty-Two and Thirty, as well as in allegations sprinkled liberally

24   throughout the petition, petitioner claims his rights were violated by the sealing of various

25   records, transcripts and proceedings in the trial court.

26           In Ground Eighteen petitioner alleges *inter alia* that he was improperly forced to take the

27   stand, without an adequate opportunity to prepare, due to the pretrial lack of access to information

28   about the state's case.  He objects to the superior court's sealing of various documents, and the

1  continued sealing of the documents and transcripts on appeal and throughout post-conviction

2  proceedings.  ECF No. 10 at 40-48 (TOC); ECF No. 10-3 at 78 through 10-4 at 41.

3  In Ground Twenty-Two petitioner alleges that he was deprived of the right to be present at

4  all critical stages of the proceedings.  ECF No. 10 at 53 (TOC); ECF No. 10-5 at 14-16.

5  In Ground Thirty, petitioner contends that his rights were violated in state post-conviction

6  proceedings by the facts that (1) so much of the record remained sealed and unavailable to him,

7  and (2) the habeas petition submitted to the superior court was adjudicated by the trial judge.

8  ECF No. 10 at 55 (TOC); ECF No. 10-5 at 40-41.

9  B.  The Clearly Established Federal Law

10  The right to an open public trial is a shared right of the accused and the public, the

11  common concern being the assurance of fairness.  Press-Enterprise Co. v. Superior Court, 478

12  U.S. 1, 7 (1986).  The defendant's right to a public trial arises under the Sixth Amendment, and is

13  "no less protective of a public trial" than the First Amendment rights of the press and public.

14  Waller v. Georgia, 467 U.S. 39 (1984).  The constitutional requirement of a public trial "is

15  satisfied by the opportunity of members of the public and the press to attend the trial and to report

16  what they have observed."  Nixon v. Warner Commc'ns, Inc., 435 U.S. 589, 610 (1978).

17  The Sixth Amendment guarantees the right of a criminal defendant to be present at all

18  critical stages of the trial.  Faretta v. California, 422 U.S. 806, 819 (1975).

19  Errors of state law do not present constitutional claims cognizable in habeas.  Pulley v.

20  Harris, 465 U.S. 37, 41 (1984).

21  C.  The State Court's Ruling

22  Ground Eighteen was denied by the superior court because (1) it did not state a prima

23  facie case of an unfair trial, and (2) it did not raise any new facts.  Lodged Doc. 10 at 5.  The

24  superior court denied Ground Twenty-Two because it raised no new issues or facts.  Id.  Ground

25  Thirty, like all other grounds, was denied by the California Supreme Court without comment or

26  citation.

27  D.  Objective Unreasonableness Under 28 U.S.C. § 2254(d)

28  Summary denial of these claims does not constitute an unreasonable application of clearly

1   established federal law, because no Supreme Court precedent prohibits the otherwise lawful

2   sealing of sensitive portions of a criminal trial record.  Petitioner's arguments under California

3   law – both as to the sealing of records and as to the trial judge's consideration of the habeas

4   petition – are unavailing here.  See Pulley v. Harris, 465 U.S. at 41.

5          The courtroom was never closed, so petitioner was not denied a public trial.  Petitioner

6   identifies no critical stage of the proceeding for which he was not personally present, and the

7   court's review of the transcript reveals no such proceeding.  Petitioner's claim that he was forced

8   to take the stand lacks factual and legal support.  Moreover, and fatally to the claim, defense

9   counsel was not denied access to any of the sealed materials at or in relation to trial.[28]  On appeal,

10  appellate counsel's motions for unsealing were granted and counsel was provided access to all

11  requested materials.[29]  No Supreme Court authority holds that a criminal defendant has a right to

12  personally review documents that qualify for sealing under state law.  Accordingly, AEDPA bars

13  relief on these claims.

14      XII.   Pre-Accusation Delay

15          A. Petitioner's Allegations

16          In Ground Twenty-Three, petitioner claims that his due process rights were violated by

17  pre-accusation delay that impaired his ability to defend against the charges.  ECF No. 10 at 53-54

18  (TOC); ECF No. 10-5 at 16-35.

19          Betty Cloer was murdered in 1971.  DNA analysis matched the victim's clothing to

20  petitioner's DNA sample in July 2002.  Petitioner was charged in October 2003.  Petitioner

21  moved to dismiss for pre-accusation delay, and that motion was denied.  8 CT 2121, 2352.

22  Petitioner identifies five categories of exculpatory evidence that he alleges were lost because of

23  the delay: (1) missing biological samples; (2) missing reports; (3) deaths of witnesses; (4) lost

24  memories; and (5) alibi evidence.  Petitioner focuses on his inability to prove, more than thirty

25  _____

[28] The initial pre-trial withholding of information such as Stanley Ellis's identity and location was
26  litigated and resulted in defense access.

[29] People v. Phillip Arthur Thompson, Case No. C058768 (Cal. Ct. App., 3d Dist.) available at
27  http://appellatecases.courtinfo.ca.gov/search/case/dockets.cfm?dist=3&doc_id=1367558&doc_no
    =C058768.

28

1   years later, that he had been in Florida when Betty Cloer was murdered, and on investigative

2   leads from 1971 that had gone cold before his trial and could no longer lead to the real killer.

3                    B.   The Clearly Established Federal Law

4        The Sixth Amendment speedy trial guarantee does not apply to pre-charging delay.

5   United States v. Marion, 404 U.S. 307, 320, 322 (1971).  Such delay may in some circumstances

6   offend due process, however.  Id.  Proof of prejudice is a necessary but not sufficient element of a

7   due process claim.  United States v. Lovasco, 431 U.S. 783, 790 (1977).  The due process inquiry

8   considers both the reasons for the delay and the prejudice to the accused.  Id., see also United

9   States v. Valenzuela-Bernal, 458 U.S. 858, 868-69 (1982).  In this context, the U.S. Supreme

10  Court distinguishes between investigative delay and government delay that is undertaken to gain

11  tactical advantage.  Lovasco, 431 U.S. at 795.  "[T]o prosecute a defendant following

12  investigative delay does not deprive him of due process, even if his defense might have been

13  somewhat prejudiced by the lapse of time."  Id. at 796.

14                   C.   The State Court's Ruling

15       This issue was exhausted on direct appeal.  Because the California Supreme Court denied

16  discretionary review, this court looks through to the reasoned decision of the California Court of

17  Appeal.  See Ylst v. Nunnemaker, 501 U.S. 797; Ortiz v. Yates, 704 F.3d at 1034.

18       The Court of Appeal's discussion of this issue is lengthy and need not be set forth here in

19  full.  See Lodged Doc. 8 at 48-55.  The appellate court relied on California authority holding that

20  a federal due process claim based on pre-accusation delay requires that the delay was undertaken

21  to gain a tactical advantage over the defendant.  Id. at 51-52 (citing People v. Catlin, 26 Cal. 4th

22  81, 107 (2001)).  It found no such purposeful delay.  Id. at 52.  The court also held, with citation

23  to People v. Nelson, 43 Cal. 4th 1242 (2008), that the prejudice to petitioner did not outweigh the

24  justification for the delay.  Id. at 53-55.

25                   D.   Objective Unreasonableness Under 28 U.S.C. § 2254(d)

26       The California Supreme Court decision on which the appellate court relied, People v.

27  Nelson, supra, held that the prosecution of a 1976 murder on the basis of 2002 DNA results did

28  not violate due process.  The Nelson court based its decision on Marion, Lovasco, and progeny,

1   which it reasonably applied.  There was no unreasonable application of those principles here.  The

2   lengthy delay in this case was caused by the fact that DNA analysis was not available until 2002.

3   The appellate court weighed the reasons for the delay against the prejudice to petitioner, which it

4   found to be speculative.  Lodged Doc. 8 at 53, 54.  Nothing about that analysis involves an

5   unreasonable determination of the facts or an unreasonable application of clearly established due

6   process standards.  While a delay of over thirty years in identifying a murder suspect creates

7   obvious challenges for both the prosecution and the defense, the problems of proof (and

8   correlative defense issues) are different in a DNA case than they are in a case that turns on

9   eyewitness identification.[30]

10       No U.S. Supreme Court precedent holds that due process is violated by delay where a

11   DNA "cold hit" solves a long-cold case.  Indeed, the Supreme Court has never found that any

12   particular pre-charging delay violated due process, nor has it specified a precise due process

13   standard for delay claims.  See Lovasco, 431 U.S. at 796-97.  The application of a general

14   standard to specific facts is entitled to particularly broad deference under AEDPA.  Yarborough

15   v. Alvarado, 541 U.S. 652, 664 (2004).  For all these reasons, the state court's decision may not

16   be disturbed.

17       XIII.   Insufficient Evidence To Support Conviction

18           A.  Petitioner's Allegations

19       In Ground Twenty-Nine, petitioner claims that due process was violated by his conviction

20   on insufficient evidence.  ECF No. 10 at 55 (TOC); ECF No. 10-5 at 39-40.

21           B.  The Clearly Established Federal Law

22       Due process requires that each essential element of a criminal offense be proven beyond a

23   reasonable doubt.  United States v. Winship, 397 U.S. 358, 364 (1970).  In reviewing the

24   sufficiency of evidence to support a conviction, the question is "whether, viewing the evidence in

25   the light most favorable to the prosecution, *any* rational trier of fact could have found the essential

26   _____

27   [30] Petitioner vigorously challenged the reliability of the DNA evidence in light of the passage of
     time and state of the biological evidence.  The memory of percipient witnesses was also subject to
     thorough adversary testing.

28

1    elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319

2    (1974).  If the evidence supports conflicting inferences, the reviewing court must presume "that

3    the trier of fact resolved any such conflicts in favor of the prosecution," and the court must "defer

4    to that resolution." <u>Id.</u> at 326.

5                    C.  <u>The State Court's Ruling</u>

6           The California Supreme Court summarily denied the petition presenting this claim, and no

7    lower court addressed it in a reasoned opinion.  Accordingly, this court asks whether there is any

8    reasonable basis for the state court's decision.  <u>Richter</u>, 131 S. Ct. at 786.

9                    D.  <u>Objective Unreasonableness Under 28 U.S.C. § 2254(d)</u>

10          There is a reasonable basis for the state court's rejection of this claim.  The DNA

11   evidence, witness testimony that Cloer was last seen with a man matching petitioner's

12   description, the presence of petitioner's car at the gas station where she met that man, and his ex-

13   wife's reaction upon seeing the keys found at the murder scene, collectively provide a more than

14   sufficient basis for the conviction.  Indeed, California law provides that statistical evidence

15   regarding a DNA match can be sufficient without more to prove the identity of a murderer

16   beyond a reasonable doubt.  <u>People v. Xiong</u>, 215 Cal. App. 4th 1259.  Here there was more,

17   including Stanley Ellis's positive identification of petitioner as the man who was with Cloer

18   shortly before her murder.  The jury's credibility determinations, including their apparent

19   acceptance of Ellis's identification and necessary rejection of petitioner's testimony, are entitled

20   to near-total deference.  <u>Jackson</u>, 443 U.S. at 326.  When all inferences from the evidence are

21   drawn in the prosecution's favor, as required on sufficiency review, it cannot be said that no

22   rational trier of fact would have found petitioner guilty beyond a reasonable doubt.

23        XIV.   <u>Due Process Violation By Admission Of Irrelevant And Inflammatory Evidence</u>

24                    A.  <u>Petitioner's Allegations</u>

25          In Ground Thirty-Two, petitioner alleges first that his due process rights were violated by

26   testimony regarding his possession of guns unrelated to the Cloer murder.  ECF No. 10 at 56-61

27   (TOC re: Ground 32-A); ECF No. 10-5 at 43-63 (Ground 32-A).  Petitioner alleges second that

28   his due process rights were violated by the testimony of Mark Masterson, who is alleged to have

                                                       50

1  been an incompetent witness due to brain damage.  ECF No. 10 at 61-63 (TOC re: Ground 32-B);

2  ECF No. 10-5 at 63-73 (Ground 32-B).  Petitioner alleges third that his due process rights were

3  violated by admission of Ellis's testimony that Weiner had told him "this is what Thompson does

4  to his enemies."  ECF No. 10 at 63-64 (TOC re: Ground 32-C); ECF No. 10-5 at 73-76 (Ground

5  32-C).  Petitioner alleges fourth that his due process right were violated by miscellaneous other

6  evidentiary rulings, including those stated in other grounds for relief and also including the failure

7  to give a limiting instruction regarding Ellis's testimony.  ECF No. 10 at 64-65 (TOC re: Ground

8  32-D); ECF No. 10-5 at 76-79 (Ground 32-D).

9      In Ground Twenty-Four, petitioner alleges that hearsay evidence regarding the license

10  plate violated due process.  ECF No. 10-5 at 36, 38-39.

11          B.  <u>The Clearly Established Federal Law</u>

12      The erroneous admission of evidence only violates due process if the evidence is so

13  irrelevant and prejudicial that it renders the trial as a whole fundamentally unfair.  <u>Estelle v.</u>

14  <u>McGuire</u>, 502 U.S. 62.

15          C.  <u>The State Court Ruling</u>

16      These claims were summarily denied by the California Supreme Court, and no lower court

17  addressed them in a reasoned opinion.  Accordingly, this court asks whether there is any

18  reasonable basis for the state court's decision.  <u>Richter</u>, 131 S. Ct. at 786.

19          D.  <u>Objective Unreasonableness Under 28 U.S.C. § 2254(d)</u>

20      It was not objectively unreasonable for the state courts to conclude that petitioner received

21  a fundamentally fair trial despite any arguable evidentiary error, or combination of errors.  The

22  evidence of petitioner's gun ownership was neither irrelevant nor inflammatory.[31]  Ellis's

23  testimony about being threatened was relevant to his credibility and was subjected to

24  impeachment.  Even if the jury believed it, that testimony is highly unlikely to have had any

25  prejudicial effect in light of the trial record as a whole.  Similarly, admission of the license plate

26  _____

[31] Petitioner's ex-wife testified that he had owned firearms in the past, including at the time of the
27  Cloer murder.  Rape victim Melinda M. testified that petitioner had put a gun to her head.  Mark
Masterson testified that he had seen a gun in petitioner's car on the day they raped Sharon S.
28

1   evidence did not render the trial fundamentally unfair even if it was erroneous.[32]   None of the

2   many, minor evidentiary objections that petitioner expounds upon implicate the fundamental

3   fairness of his trial.

4        Regarding Mark Masterson, who testified that he and petitioner had raped Sharon S.,

5   petitioner submits a declaration from his own mother claiming that she cared for Masterson

6   following the car accident that put him in a coma in 1968, and knows him to be brain-damaged

7   and unable to tell what is real from what is unreal.   Pet. Ex. Y; <u>see also</u> ECF No. 10-5 at 69

8   (quoting Thelma Hart Decl.).   Masterson's head injury was known to counsel at the time of

9   petitioner's trial, and Masterson was questioned about the injury's long-term effects.   2 RT 489.

10  Defense counsel vigorously cross-examined Masterson, 4 RT 1025-90, and petitioner was

11  permitted to testify about incidents relevant to Masterson's memory, 8 RT 2155-58.   The jury was

12  able to directly evaluate Masterson's memory and his veracity.   The record as a whole does not

13  support the claim of fundamental unfairness, and the Thelma Hart declaration does not constitute

14  new evidence of witness incompetence that required factual development by the state habeas

15  court.

16       Because denial of these claims neither turns on unreasonable factual determinations nor

17  involves unreasonable application of U.S. Supreme Court precedent, relief is unavailable.

18      XV.   <u>Cumulative Error</u>

19       Ground Twenty-One appears to be primarily a cumulative error claim, although it also

20  generally reprises petitioner's overarching theories for relief under AEDPA standards.   <u>See</u> ECF

21  No. 10 at 50-53 (TOC); ECF No. 10-4 at 73 to 10-5 at 14.   Because none of petitioner's

22  individual substantive claims have merit, it was not unreasonable of the state court to reject his

23

24  _____

[32] The credit card slip containing license plate number DUK323 was not in evidence.   A deputy

25  sheriff was permitted to testify to his observation of the contents of that slip pursuant to Cal. Evid.
    Code § 1523(b), which allows oral testimony as to the contents of a writing where the proponent

26  does not have control of the document and the writing is lost or destroyed.   2 RT 313.   The gas
    station attendant testified about his practice of recording the license plate numbers of customer

27  vehicles on the credit card slips, and the deputy testified that he had carefully recorded those
    numbers for the night of Cloer's murder.

28

1  cumulative error claim.  See Ybarra v. McDaniel, 656 F.3d 984, 1001 (9th Cir. 2011) (petitioner

2  not entitled to relief for cumulative error where trial imperfections do not infect trial with

3  unfairness in violation of due process).

4      XVI.   Omitted Claims

5      The federal petition does not include a Ground 2, 4, 6, 8, 10, 12, 14, 26, 27, 28, or 33.  In

6  petitioner's state court applications for habeas relief, the Grounds so enumerated sought relief

7  under California law.  Those claims are not presented to this court.

8                                    CONCLUSION

9      For all the reasons explained above, the state courts' denial of petitioner's claims was not

10 objectively unreasonable within the meaning of 28 U.S.C. § 2254(d).  Accordingly, IT IS

11 RECOMMENDED that the petition for writ of habeas corpus be denied.

12     These findings and recommendations are submitted to the United States District Judge

13 assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-eight

14 days after being served with these findings and recommendations, any party may file written

15 objections with the court and serve a copy on all parties.  Such a document should be captioned

16 "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

17 shall be served and filed within fourteen days after service of the objections.  The parties are

18 advised that failure to file objections within the specified time may waive the right to appeal the

19 District Courts order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

20 DATED: May 28, 2014

21

22                                    ALLISON CLAIRE
                                     UNITED STATES MAGISTRATE JUDGE

23

24

25

26

27

28